DECISION AND JUDGMENT ENTRY
This is an appeal from the judgment of the Washington County Court of Common Pleas, which dismissed the charges against Defendant-Appellee Carroll Brown due to pre-indictment delay.
Nine-year old Anna Marie Brown disappeared on August 8, 1975, at approximately 8:00 p.m., from the Southgate Trailer Park where she lived with her parents. A neighbor discovered her body under a bush on August 13, 1975, in the same trailer park approximately one hundred feet from the trailer of the appellee, her uncle. The body was badly decomposed, and Dr. Fortunado Macatol, who performed the autopsy, was unable to determine either the cause of death or whether Anna had suffered any sexual abuse. Despite Dr. Macatol's findings, the coroner ruled that Anna had died of asphyxiation.
Larry Riehl, who was a deputy with the Washington County Sheriffs Office in 1975, conducted the majority of the initial investigation into Anna's death. Riehl interviewed several people who had seen Anna with the appellee shortly before she disappeared, including Denise Brown, Anna's sister, and Judy Snyder, a neighbor. These witnesses saw the appellee in a car with an unidentified male passenger at approximately the time that Anna disappeared. Riehl also spoke with Terry Efaw, who saw Anna about ten minutes after he saw the appellee leave the trailer park on the night of the murder. Riehl testified that he believed there was a typographical error in the report and that Efaw actually saw Anna before he saw the appellee leave, although he had no independent recollection of the conversation. Efaw also told Riehl that he had seen another murder suspect, David Luton, in the trailer park before, but he could not say exactly when he had seen Luton.
Based on the initial investigation, the Washington County Sheriff's Office developed a list of three possible suspects. One suspect was David Ray Luton, who had checked into the Athens Mental Health Center two days after Anna's body was found and apparently told hospital workers that he had killed a nine-year old girl. Riehl, Sheriff Richard Ellis and Deputy Dan Venham went to the hospital to interview Luton after Riehl received a telephone call about Luton's confession. However, Luton's treating physician, Dr. Caul, had contacted attorney Sanford Cohan to speak with Luton. Cohan would not allow Riehl to interview Luton because he believed that Luton might make incriminating statements and was not competent to waive hisMiranda rights.
The second suspect was Charles Boyd, a resident of Southgate Trailer Park who lived near the spot where Anna's body was found. Investigators considered Boyd a suspect because he had a history of pedophilia. However, Boyd was quickly eliminated as a suspect, apparently because he fully cooperated with the investigation and passed a polygraph test.
The final suspect, and the one investigators believed was most likely the killer, was the appellee. Appellee is Anna's uncle, and several witnesses placed Anna and the appellee together shortly before Anna disappeared. Appellee's trailer was approximately one hundred feet from the spot where Anna's body was found. There was also a period of approximately ninety minutes beginning around 8:00 p.m. on August 13, 1975, during which investigators could not confirm the whereabouts of the appellee. Finally, the appellee apparently argued with his brother Carl, Anna's father, and blamed Carl for getting him arrested, which investigators believed was sufficient motive for the murder.
When Anna's body was discovered on August 13, 1975, investigators obtained a search warrant for the appellee's trailer. Appellee had packed up most of his personal possessions the night that Anna disappeared and had moved to Zanesville, Ohio. Still, the deputies seized a number of items from the trailer, including a bed sheet with bloodstains on it. The Sheriffs Office sent the sheet to the Bureau of Criminal Identification and Investigation for analysis, but the blood could not be typed due to some sort of interference in the sample.
Based on the evidence available in 1975, investigators considered the appellee the most likely suspect in Anna's death. However, they believed the evidence against the appellee was too weak to seek an indictment. After several months, the Sheriffs Office ran out of leads, the investigation stalled, and it was terminated.
Over the next several years, Washington County Sheriffs deputies occasionally received new leads in Anna's case and talked to various witnesses. In 1977, Deputy Cecil Vickers interviewed David Luton as well as several employees at the Athens Mental Health Center. The record contains Deputy Vickers' handwritten notes of this interview, which indicate that Luton denied any involvement in the murder. There is also a written statement from Carl Rosler, an attendant at the hospital, to whom Luton apparently confessed to the killing in December 1975. However, there is neither a written statement signed by Luton, nor an official report from Deputy Vickers to corroborate the contents of Deputy Vickers' notes from his interview of Luton.
In 1979, Deputy Joe Clark interviewed Louise West about an incident in which the appellee allegedly admitted to the murder. West told Deputy Clark that she had dated the appellee and that he frequently abused her while they were together. West claimed that during one of their arguments the appellee threatened her by saying, "I'll kill you just like I killed her." When West asked the appellee, "You mean your brother's daughter?" the appellee answered "Yes." Apparently, there was no follow-up investigation of West's statement; and, after Deputy Clark's interview of West, there is no record of any further investigation into Anna's death for the next eighteen years.
In 1992, the Washington County Sheriffs Office opened a detective bureau with full-time responsibility for conducting investigations. Part of that bureau's responsibility was to reexamine unsolved murder cases, including the Anna Marie Brown case. The bureau reopened the investigation into Anna's death in 1997 when Lieutenant Jeffery Seevers began investigating Anna's case full-time.
Lieutenant Seevers spoke with several witnesses, including West who repeated the statements she made to Deputy Clark in 1979. The investigation also uncovered certain new information, which allegedly bolstered the state's case against the appellee.
 1. Jeane Beatty, Anna's mother told Lieutenant Seevers about an argument between the appellee and Carl Brown, Anna's father. Appellee accused Carl of having an affair with the appellee's wife and threatened to harm Carl's children in revenge.
 2. Lieutenant Seevers also had Beatty wear a bodywire and talk to the appellee under the ruse that Beatty was dying and wanted to clear up her doubts about Anna's murder. Appellee allegedly gave a "tacit admission," of guilt by saying that he did not beat his own children, so he would not have beaten Anna. Lieutenant Seevers found this statement remarkable because the cause of Anna's death had never been determined.
 3. Lieutenant Seevers forwarded information about the case to Dr. William Bass, a forensic anthropologist. After reviewing photos of Anna's body, Dr. Bass gave the opinion that most likely Anna was killed at the same time that she disappeared. Dr. Bass also felt that accelerated decomposition in Anna's face indicated that she likely had blood or open wounds on her face.
Lieutenant Seevers had a DNA test performed on the sheet seized from the appellee's apartment. The sheet contains five stains, four of which yielded no DNA evidence at all. The fifth stain contained blood from at least two people. The test excluded the appellee as being the source of any of the blood. Unfortunately, the test was less definitive with respect to Anna. Anna was excluded as the primary source of the blood, but the test could neither include nor exclude her as the secondary source of blood.
Based on the information uncovered by Lieutenant Seevers, the Washington County Prosecutor's Office presented Anna's case to the Washington County Grand Jury. On December 10, 1997, the grand jury indicted the appellee for Anna's murder, in violation of R.C2903.02. On February 11, 1998, the appellee filed a motion to dismiss, alleging that the twenty-two year pre-indictment delay violated his due process rights under the Ohio and United States Constitutions. The trial court held a hearing on the appellee's motion on May 7 and 8, 1998. After the hearing, both parties filed briefs on the motion. The trial court sustained the motion and dismissed the charge against the appellee.
Appellant presents four assignments of error for our review:
 I. THE TRIAL COURT ERRED IN FINDING THAT THE APPELLEE HAD SHOWN ACTUAL PREJUDICE.
 II. THE TRIAL COURT ERRED IN FINDING THAT THE STATE HAD FAILED TO JUSTIFY THE DELAY IN INDICTMENT.
 III. THE TRIAL COURT ERRED IN SHIFTING THE BURDEN TO JUSTIFY THE DELAY TO THE STATE.
IV. THE TRIAL COURT ERRED IN DISMISSING THE INDICTMENT.
 I.
Two distinct constitutional principles protect criminal defendants against oppressive and unnecessary delays in prosecution of their cases. The Sixth Amendment to the United States Constitution provides a criminal defendant with the right to a speedy trial. This right, however, does not apply until the defendant has been formally charged with a crime. United Statesv. Lovasco (1977), 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752. Prior to indictment or other formal charge, statutes of limitation provide criminal defendants with their primary protection against the state prosecuting stale cases. In the instant case, the appellee has been charged with murder, for which there is no statute of limitation. However, the United States Supreme Court has recognized that the Due Process Clauses of the Fifth and Fourteenth Amendments also play a limited role in protecting criminal defendants from pre-accusation delay. Id.
The instant case involves a delay of twenty-two years between the commission of the crime and the appellant's presentation of its case against the appellee to the grand jury, which, the appellee claims, violates his due process rights. In order for the state's delay in bringing an indictment to constitute a violation of due process the delay must prejudice the defense, and the state's reason for delaying the indictment must be unreasonable. Lovasco. The defendant must prove that the delay caused actual prejudice to his defense in order for the claim to be ripe for the court's review. Id. Once the defendant has established actual prejudice, the burden shifts to the state to justify its reasons for delaying prosecution of the case. Statev. Whiting (1998), 84 Ohio St.3d 215, 702 N.E.2d 1199.
The leading Ohio case on pre-indictment delay is State v. Luck
(1984), 15 Ohio St.3d 150, 472 N.E.2d 1097. Under Luck, the state's delay in bringing criminal charges may violate the defendant's due process rights if the delay causes actual prejudice to the defense and the state does not justify the delay. In order to determine prejudice, the court must balance the evidence lost to the defense against the remaining evidence in the case, including any newly discovered evidence. Id. at 154,472 N.E.2d at 1102.
In discussing the state's justification for the delay, the Luck court noted "that it would be unwise to adopt a rule requiring the commencement of prosecution whenever there is `sufficient evidence to prove guilt beyond a reasonable doubt'." Id. at 158,472 N.E.2d at 1105 (citing Lovasco). However, the court ruled that the state is not justified in intentionally delaying an indictment in order to gain a tactical advantage, or in negligently stopping the investigation and subsequently prosecuting the case based entirely on old evidence. Id. "The length of the delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable." Id.
Before addressing the appellant's assignments of error we should comment on our standard of review in this case. Appellee argues that we should apply an abuse of discretion standard to the trial court's dismissal of the indictment. However, we have previously addressed this issue in State v. Jones (June 4, 1996), Ross App. No. 95CA2128, unreported, and we are convinced that our reasoning in Jones was correct. Pre-indictment delay cases involve mixed questions of law and fact. With respect to factual issues, the trial court was in the best position to weigh the evidence and judge its credibility, so we shall defer to the trial court's factual findings so long as some competent, credible evidence supports them. However, we shall independently apply the Luck standard to those facts and draw our own legal conclusions. Id.
 II.
Appellant's First Assignment of Error alleges that the trial court erred in finding that the appellee had suffered actual prejudice to his defense as a result of the twenty-two year delay between Anna's death and the indictment of the appellee. As the appellant argues, a pre-indictment delay does not violate due process unless it causes prejudice to the defense that is actual and concrete, not merely speculative. United States v. Marion
(1971), 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468. In addition, the defendant bears the burden of proving that the delay prejudiced his defense. Luck, supra. In the instant case, numerous investigators, witnesses, and even suspects have died and some physical evidence has been lost. However, the appellant argues that the appellee has not shown how any of the lost evidence or testimony has prejudiced him.
The trial court listed twelve examples of witnesses or physical evidence that are no longer available in this case to support its finding that the appellee suffered actual prejudice as a result of the pre-indictment delay. For each of the cited examples, the appellant argues that the appellee did not prove how the missing evidence would have benefited his defense. There may be some merit to the appellant's argument regarding several of the examples listed by the trial court. However, at least five of the trial court's findings, which are listed and analyzed below, support the conclusion of the trial court that the delay has caused actual prejudice to the appellee's defense.
 1. David Ray Luton is deceased and his body has been cremated. Mr. Luton initially confessed to this crime to Dr. Caul at the Athens State Mental Hospital a few days after the body was found. His body was cremated, making his body inaccessible for further (DNA) testing to determine if his blood was the blood found in the Defendant's master bedroom during the search by the Washington County Sheriff's Department.
Appellant argues that the appellee did not prove that Luton would testify or that his DNA would be material to the defense. There is some merit to the appellant's argument that Luton's testimony is not material to the defense. If Luton were alive, he could not be compelled to testify against himself, and further, it is not reasonable to expect that he would confess to the crime in any event. As the appellant argues, Luton's death means that the appellee can accuse him of being the killer without Luton being able to deny the charge. However, we are persuaded that the appellee is prejudiced by the loss of Luton's DNA.
Appellant contends that the trial court erred in finding that the loss of Luton's DNA prejudiced the defense because the appellee did not show that Luton's DNA is material to the case. Appellant's reasoning, however, is somewhat circular. According to the appellant's argument, the appellee must prove that Luton is connected to the murder in order to establish that the loss of his DNA has prejudiced the defense. Appellee cannot affirmatively connect Luton to the murder without connecting him to the bloodstains on the sheet seized from the appellee's trailer. Appellee cannot prove Luton's blood is on the sheet without testing a sample of Luton's DNA. Since Luton's DNA is no longer available, the appellant argues that the appellee cannot prove that its loss has prejudiced the defense.
Contrary to the appellant's argument, it is the very fact that we cannot test Luton's DNA against the blood on the sheet that prejudices the appellee. The DNA test established that there is blood from at least two people on the sheet taken from the appellee's trailer. Anna's blood might be on the sheet, but the DNA test could not establish that conclusively. The test did establish that the appellee's blood was not on the sheet, so the blood must have come from a third person.
This situation is analogous to the position of the defendant inLuck. Katherine Luck claimed that she had acted in self-defense, but the only person who could corroborate her story, Larry Cassano, was dead. Luck at 157-58, 472 N.E.2d at 1104. Obviously, Luck could not prove what testimony Cassano would give if he were alive. However, assuming that Luck's version of events was accurate, the court held that she was prejudiced by the death of the only witness who could corroborate her story.[1] Id.
In the instant case, the appellee maintains that he was not involved in Anna's murder, and points to Luton as a more likely suspect. Since Luton is dead and his body was cremated, there is no way to obtain a sample of his DNA to compare with the blood on the bed sheet seized from the appellee's trailer. Assuming that the sheet is tied to the murder, the appellee is prejudiced by not being able to prove that Luton's blood is on the sheet.
 2. Dr. Caul is now deceased. Dr. Caul treated Mr. Luton at Athens State Mental Hospital for many years and apparently was the confidant to whom Mr. Luton confessed to regarding this murder. It must be remembered that two witnesses identified Mr. Luton as having been in the area of the Southgate Trailer Park, the place where the victim resided and was found murdered.
Appellant disputes the trial court's finding with respect to Dr. Caul claiming that Carl Rosler, and not Dr. Caul, actually heard Luton's confession to Anna's murder. Even if Luton had told Dr. Caul that he killed Anna, the appellant argues that physician-patient privilege would bar Dr. Caul from testifying. Since Dr. Caul did not hear the alleged confession, and he could not testify about it anyway, the appellant argues that his death has not prejudiced the defense.
As we noted above, we shall defer to the trial court's factual findings so long as some competent, credible evidence supports those findings. The testimony at the hearing on the motion to dismiss is not entirely clear on exactly who heard Luton's confession and in what context. Rosler, who was an attendant at the mental hospital where Luton was a patient, did provide a written statement in which he stated that he talked to Luton about the murder in December 1975. Riehl, however, attempted to interview Luton in late August 1975, shortly after Anna's body was found. It appears from the record that Luton talked to a number of people at the Athens Mental Health Center about the murder. Dr. Caul obviously was aware of Luton's statements because Dr. Caul is the one who ultimately contacted Sanford Cohan, a public defender, to speak with Luton. The record, therefore, supports the trial court's finding that Dr. Caul could have testified about Luton's statements concerning the murder.
The fact that Luton spoke openly with hospital personnel about the murder also shows why the appellant's argument regarding physician-patient privilege must fail. The testimonial privilege granted to confidential physician-patient communications by R.C.2317.02 extends to psychologist-patient relationships under R.C.4732.19. Traditionally, courts strictly construe the physician-patient privilege in favor of admissibility because it deviates from the common law. Hollis v. Finger (1990), 69 Ohio App.3d 286,590 N.E.2d 784. In order for the privilege to apply, the communication must be made within the scope of the physician-patient relationship. In re Smith (1982), 7 Ohio App.3d 75,454 N.E.2d 171.
In the instant case, it appears that Luton's statements concerning the murder were not made in the course of his treatment with Dr. Caul. Rather, it seems that Luton was willing to talk to anyone who would listen about his fear that he had killed a nine-year old girl. This is at least part of the reason that Dr. Caul was concerned about the prospect of Riehl questioning Luton about the murder. It is possible that Luton made statements to Dr. Caul during the course of therapy sessions that would be privileged. It is clear, however, that Luton also talked about the murder in situations that had nothing to do with his treatment, thereby removing those communications from the protection afforded by the privilege.
Appellant argues that Dr. Caul's testimony is unnecessary because Rosler and Attorney Cohan could still testify about Luton's statements about the murder. Contrary to the appellant's argument, Rosler did not speak with Luton until December 1975. The key issue is what Luton said in August 1975 when he checked himself into the hospital shortly after Anna's body was found. Attorney Cohan, on the other hand, spoke with Luton in August 1975, but he testified that he only knew that Luton had apparently confessed to a murder and he was not aware of what Luton might have said to the hospital staff.
The record supports the trial court's finding that Dr. Caul could have testified about Luton's original confession to the murder. The record does not establish that any other witnesses are available who spoke with Luton about the murder in August 1975. Given the benefit that Luton's statements would give to the defense, we agree with the trial court that Dr. Caul's unavailability has prejudiced the appellee.
 3. Many of the items obtained as a result of a search of the Defendant's home by the Washington County Sheriff's Office a day after the discovery of the victim's body are missing and cannot be located. (In fact, items were still being located a few hours before the Court hearing on this Motion on May 7, 1998.)
Appellant argues that the appellee failed to establish that he has been prejudiced by the loss of physical evidence because he did not identify any missing items that were material to the defense. It is true that the appellee bears the burden of proving that he has suffered actual and concrete prejudice due to the pre-indictment delay. However, we are convinced that under the circumstances of this case the appellee has suffered actual prejudice as a result of the missing evidence
The Washington County Sheriff's Office was responsible for the inventory and storage of the physical evidence seized from the appellee's trailer. Several items that were specifically identified on the inventory sheet are now missing. In addition, the inventory sheet lists two now-missing trashcans that contained "miscellaneous items." The trashcans themselves are immaterial; it is the loss of their contents that has prejudiced the defense.
In any procedural due process case, the essential question is whether the state's actions violate "those `fundamental conceptions of justice which lie at the base of our civil and political institutions,' and define `the community's sense of fair play and decency'." Lovasco at 790, 97 S.Ct. at 2049
(citations omitted). Appellant had custody of the evidence in question, and the loss of that evidence must be attributed to the appellant's negligence. The fact that the appellee cannot specifically identify all of the items that are missing is due to the appellant's failure to identify the miscellaneous items on the inventory sheet. Deputies considered these items important enough to seize, so they must have had some bearing on the investigation. It is fundamentally unfair for the appellant to assert that the appellee cannot establish prejudice from the loss of evidence that was in the sole control of the state and that was lost during the twenty-two year period of delay.
 4. Denise Brown, sister of the victim, and the last person to see the victim alive, is now deceased.
Appellant argues that the appellee did not show that Denise would offer any testimony that would be material to the defense. In addition, the appellant argues that several other people also saw the appellee with Anna shortly before she disappeared. Since other witnesses can offer the same testimony as Denise, the appellant argues that her death has not prejudiced the appellee.
The prejudice to the appellee as a result of Denise Brown's death may not be immediately obvious because her testimony largely tends to incriminate the appellee. However, several witnesses who saw the appellee in the trailer park shortly before Anna disappeared also saw another man in the appellee's car. Witnesses saw the appellee and his companion leave the trailer park at a high rate of speed shortly afterwards. Appellee cannot remember who he was with that evening and none of the appellant's witnesses are able to identify this man, so Denise is the only one who might still recognize this individual.
The identity of the appellee's companion is important because the appellant's case is based in part on the fact that investigators cannot confirm the appellee's whereabouts for approximately ninety minutes, beginning about the same time that Anna disappeared. The testimony at the motion to dismiss hearing indicates that the critical time period in this case is actually much more narrow than that. Several witnesses saw the appellee leave the trailer park at a high rate of speed a few minutes after he was seen with Anna. Assuming that the appellee did kill Anna, three factors establish that he must have committed the murder in the few minutes before he left the trailer park: Anna's body was found in the trailer park; Appellee never returned to the trailer park; and Dr. Bass offered the opinion that Anna was killed at the same time that she disappeared. Even if the appellee's companion was not able to testify about the appellee's whereabouts during the entire ninety-minute period about which the appellant is concerned, he could well establish what the appellee did in the critical ten-minute period in the trailer park.
 5. Deputy Joe Clark is now deceased. Deputy Clark took a statement in 1979 from Eleanor Louise West regarding a statement by the Defendant.
Appellant argues that the appellee did not show that Deputy Clark's testimony would be admissible or that it would be material to the defense. In fact, West is still available, and her testimony incriminates the appellee.
West's statement incriminates the appellee, and she apparently gave Lieutenant Seevers a taped statement that was substantially the same as that told to Deputy Clark in 1979. If the appellee did confess to the murder as West claims, then her testimony would be very damaging to the defense. However, the Sheriff's Office did not follow up on West's allegations for eighteen years. If Deputy Clark found West to be credible, his death prevents the appellee from cross-examining him as to why the Sheriff's Office did not take any action based on her statement.
We agree with the trial court that these five examples of lost evidence demonstrate that the twenty-two year delay in this case has compromised the appellee's ability to present his defense. The delay is not prejudicial for due process purposes, however, unless the lost evidence could reasonably assist the appellee at trial. Luck, supra. We must, therefore, examine the appellant's existing evidence and balance it against the evidence lost to the appellee as a result of the delay.
Appellant has taken the position that it is not required to present its case at this stage of the litigation and that it has no intention of doing so. We agree with the appellant that the defendant bears the burden of establishing prejudice from the pre-indictment delay and that, as a matter of public policy, the state is not required to reveal its entire strategy prior to trial. However, in a case such as this one, with a lengthy pre-indictment delay and a significant amount of lost evidence, if the state fails to make a sufficient record to rebut the defendant's showing of prejudice, it does so at its own peril.
In 1975, the Sheriff's Office had some circumstantial evidence that implicated the appellee in Anna's murder. First, investigators could not establish where the appellee was for a period of approximately ninety minutes, commencing at about the same time that Anna disappeared. Second, several witnesses saw the appellee and heard him call to Anna shortly before she disappeared. Next, the appellee had been arguing with his brother Carl, Anna's father, and apparently the appellee blamed Carl for getting him arrested. Finally, the bloodstained sheet seized from the appellee's trailer appeared to implicate him in the murder.[2] Despite this evidence, investigators decided that there was not sufficient evidence in 1975 to indict the appellee for Anna's murder.
Since the winding down of the initial investigation in 1975, the Sheriff's Office has collected some new evidence. In 1979, Louise West came forward and claimed that the appellee admitted to the murder when he threatened her. When Lieutenant Seevers reopened the investigation in 1997, he spoke with Jeane Beatty, Anna's mother, and discovered a new motive for the appellee. Beatty told Lieutenant Seevers that the appellee believed Carl had an affair with his wife, which caused his marriage to fail. According to Beatty, in January 1975 the appellee threatened to exact his revenge by hurting Carl's children. Also, Beatty told Lieutenant Seevers that the appellee attempted to rape her at knifepoint about a month before Anna's murder.
Lieutenant Seevers also believed the appellee gave a "tacit admission" to the murder when Beatty conversed with the appellee while she was wearing a bodywire. Lieutenant Seevers had Beatty talk to the appellee under the ruse that Beatty was dying of cancer and wanted to put her mind at rest about Anna's murder. Appellee apologized to Beatty for trying to rape her, but he denied any involvement with Anna's murder. He claimed that he was not in Marietta at the time of the murder, that he had passed a polygraph test, and told Beatty, "I didn't even beat my own kids, why would I beat Annie?" Lieutenant Seevers believed this last statement was a tacit admission because previously there had never been any indication that Anna had been beaten.
Lieutenant Seevers contacted Dr. William Bass at the University of Tennessee to establish a time of death and determine if Anna had been beaten. Dr. Bass is a forensic anthropologist who apparently has done extensive study of the decomposition rate of human bodies. Dr. Bass looked at photographs of Anna's body and offered the opinion that the rate of decomposition suggested Anna was most likely killed at the same time that she disappeared. Dr. Bass also told Lieutenant Seevers that there was accelerated decomposition in Anna's face, which indicated that there might have been blood or open wounds on her face.
Appellant has assembled sufficient circumstantial evidence that could lead reasonable minds to conclude that the appellee murdered Anna. The evidence against the appellee, however, is by no means overwhelming. The appellee's "tacit admission" is speculative at best and rests entirely upon Lieutenant Seevers' belief that Anna was beaten. This belief is based on the fact that Anna was missing several teeth and Dr. Bass' opinion that accelerated decomposition in Anna's face resulted from blood or open wounds. As the trial court found, however, Dr. Bass reviewed photos of the body, while Dr. Macatol performed the actual autopsy and found no evidence of trauma to Anna's face, such as broken teeth or bones. Dr. Macatol also testified that maggots could have pushed teeth out of the skull, that other animals could have removed the teeth, and that Anna's entire body was badly decomposed. In addition, Anna's murderer concealed her body underneath a bush, which could account for any open wounds on her face.
The fact that the appellee attempted to rape Beatty a month before Anna's murder is far more damaging. Still, as repulsive as the appellee's actions were, attempted rape is quite different from brutally murdering a nine-year-old girl. In addition, the appellee did not go through with the rape, which raises the question of why he would then commit an even more heinous crime some thirty days thereafter for the same reason that he had initiated the aborted rape attempt, revenge against his brother Carl.
Perhaps the only new evidence gathered by Lieutenant Seevers that directly implicates the appellee is the threat that the appellee made in 1975 concerning his brother Carl's children. Apparently, the appellee accused Carl of having an affair with his wife and breaking up the appellee's marriage. According to Beatty, in late January 1975, the appellee told her that he intended to seek revenge by hurting her and Carl's children. Beatty claims that she was so upset by this that she attempted to run over the appellee as they were leaving the bar that evening. Appellant claims that Lieutenant Seevers confirmed a portion of Beatty's story when he obtained a report from the Marietta Police Department concerning Beatty's arrest for DUI in late January 1975.
The trial court found that the appellant's theory on motive, i.e. revenge, is the same now as it was in 1975. We cannot agree with this particular portion of the trial court's decision. In 1975, investigator's believed the appellee was angry with his brother Carl for getting him arrested. Appellant now asserts that the appellee killed Anna because he blamed Carl for breaking up his marriage. In both instances the appellant's theory of motive is that the appellee sought revenge against his brother, Carl. However, the underlying rationale behind each of the two instances is hardly comparable, especially considering the appellee's apparent threat to Carl's children and Anna's subsequent disappearance and death. Appellant's current theory that the appellee sought revenge against his brother, Carl, for breaking up his marriage is, therefore, more incriminating to the appellee than the original theory.
This newly advanced theory of motive, however, does not significantly strengthen the appellant's case against the appellee. Appellee allegedly threatened Carl's children more than six months before Anna disappeared, and Beatty waited twenty-two years before she mentioned anything about this incident to Lieutenant Seevers. Although Lieutenant Seevers attempted to corroborate her allegations, the record does not establish that Beatty's arrest for DUI arose out of an attempt to hit the appellee with her car. Therefore, while the appellant's new motivational theory would be prejudicial to the appellee, it appears to carry little weight or credibility.
Appellant's evidence simply is not strong enough to outweigh the prejudicial effect of the loss of exculpatory evidence. Luton remains a potential suspect, but his death and cremation eliminated any possibility of tying him to the murder through DNA testing. The strongest evidence of Luton's confession died with Dr. Caul. The death of Denise Brown and the fading memories of other witnesses make it impossible to identify the man who was with the appellee in the trailer park on the night of the murder. Deputy Clark's death prevents the appellee from asking him why no one followed up on Louise West's statement if she was considered credible. Finally, the state's negligence in identifying and storing physical evidence prevents the appellee from either discovering what those items were or determining whether they had any impact on the state's decision not to seek an indictment against the appellee in 1975. We find that the trial court correctly ruled that the appellee has proven actual prejudice as a result of the twenty-two year delay between Anna's murder and the indictment in this case.
Appellant's First Assignment of Error is OVERRULED.
 III.
Appellant's Second Assigmnent of Error claims that the trial court erred in finding that the twenty-two year pre-indictment delay was not justified. The Luck Court held that a delay may not be justified if the state intentionally delays to gain some tactical advantage or if the state negligently ceases its investigation and later commences prosecution based entirely on evidence that was available when the active investigation stopped. Luck at 158, 472 N.E.2d at 1105. Appellant argues that these are the only two situations in which pre-indictment delay may be considered unreasonable. We disagree.
In Lovasco, the United States Supreme Court expressly rejected the idea of adopting a bright-line rule for pre-indictment delay cases. Lovasco at 796-97. Nor did the Luck Court attempt to establish a hard-and-fast rule applicable to all cases of this type. Indeed, the Luck Court recognized that adopting a strict rule would unreasonably limit the prosecutor's discretion. Luck
at 158, 472 N.E.2d at 1105.
Appellant also argues, however, that the delay in this case was for investigative purposes and, under Lovasco, such a delay is never unreasonable. As with Luck, the appellant reads too much into the Lovasco Court's decision. In Lovasco, the United States Supreme Court affirmed its position that it could not "determine in the abstract the circumstances in which pre-accusation delay would require dismissing prosecutions." Lovasco at 797. Under the particular circumstances of Lovasco, the Court held that an investigative delay does not violate due process "even if [the] defense might be somewhat prejudiced by the lapse of time." Id.
at 796.
Lovasco involved a delay of seventeen months between the government's discovery of the crime and the commencement of prosecution. During that time, federal agents conducted an active investigation that they expected would reveal the defendant's accomplices. Two witnesses that the defendant claimed were material to his defense died during that period as well. In contrast, the instant case involves a twenty-two year delay between Anna's murder and the commencement of prosecution. It is clear that through most of that period there was no active investigation in the case. Applying the holding of the Lovasco
Court to the instant case would essentially permit the state to justify even the most unreasonable delay by simply labeling it "investigative."
Our reading of Luck and Lovasco convinces us that we must examine the totality of the circumstances in each case in order to determine if the delay involved is justifiable. As the Luck court noted, the length of the delay will normally be a key factor in determining whether or not the delay was reasonable.Luck at 158, 472 N.E.2d at 1105. This approach requires an analysis of the unique characteristics of each particular case. However, as a general rule, the longer the delay and the greater the prejudice to the defense, the less will be the degree of culpability required on the part of the state in order to find a violation of due process. On the other hand, it may well be that a short delay will violate the defendant's rights only if the state intentionally delays prosecuting the case to gain an unfair tactical advantage.
Considering all of the circumstances of the instant case, we agree with the trial court's conclusion that the twenty-two year pre-indictment delay in the instant case is not justified. While the Sheriff's Office may have been short of manpower through much of the twenty-two year period, and there was some additional investigation, it appears that the delay was primarily due to the state's failure to diligently pursue the case.
The Washington County Sheriffs Office established a detective bureau in 1992, yet the active investigation into Anna's murder was not reopened until five years later. As the trial court noted, this five-year period constitutes more than one-fifth of the total pre-indictment delay in this case. In addition, the active investigation was reopened eleven years after DNA testing became available for use in criminal investigations. According to Dr. Robert Williams', appellee's DNA expert, DNA tests on Anna could have been more conclusive if the tests had been performed earlier. Finally, Louise West reported the appellee's threat to her in 1979, but there was no follow up investigation until Lieutenant Seevers began working on the case eighteen years later.
We are mindful that even today law enforcement agencies often do not have the resources they need to pursue active, thorough investigations of every crime. Appellant, however, portrays the Washington County Sheriff's Office as being completely unable to conduct any in-depth investigations in the 1970s and 1980s. As the trial court noted, this is contradicted by Sheriff Ellis' testimony that his office had investigated and solved a number of murder cases prior to Anna's murder. Appellant's argument also defies logic and common sense. It appears that the appellant would have this court believe that, before the detective bureau opened, any crime investigated by the Washington County Sheriff's Office that did not result in an arrest after a brief investigation went unsolved and unpunished.
Taken in isolation, the individual delays in the instant case appear reasonable enough. Considered together, however, the state's lack of diligence in investigating this case over a twenty-two year period is unreasonable. It is reasonable that the state would not immediately follow up on West's statement in 1979, but the appellant did not explain why eighteen years passed before the state took any action at all. It is reasonable that the state did not rush to submit its evidence for DNA testing as soon as such procedures became available in 1986, but the appellant did not explain why the state waited eleven years to utilize this technology. It is reasonable that the newly established detective bureau would not immediately open full scale investigations into all unsolved cases in 1992, but the state did not explain why five years elapsed before anyone bothered to review Anna's case.
Under the circumstances of this case, twenty-two years constituted an unreasonably long period of time for the investigation into Anna's death to lie totally dormant. As this case demonstrates, over time witnesses die, evidence becomes lost and memories fade. This restricts the state's ability to prosecute crimes, but the loss of evidence is much more prejudicial to the defendant. In most cases, the state can preserve whatever evidence it obtains in the initial investigation, and it will prosecute an old case only after it discovers new evidence that implicates the defendant. The defendant, on the other hand, has no way to preserve exculpatory evidence that could prove his innocence. That is why law enforcement agencies must be all the more diligent in following up leads and applying new technologies to old, unsolved cases.
We agree with the trial court that the appellant failed to justify its reasons for the twenty-two year pre-indictment delay in this case. Accordingly, the appellant's Second Assignment of Error is OVERRULED.
 IV.
In its Third Assignment of Error, appellant argues that the trial court erred in placing the burden of justifying the delay on the state. Appellant relies on State v. Whiting (Sept. 5, 1997), Miami App. No. 96CA13, unreported [hereinafter Whiting I]. In Whiting, the Second District Court of Appeals held that, while the defendant has the ultimate burden of persuasion on the reasonableness of a pre-indictment delay, the state bears the burden of going forward with some evidence to justify the delay once the defendant establishes prejudice. The appellate court found, however, that the trial court had mislead the state with respect to the burden of proof, so it reversed the trial court's decision to give the state an opportunity to meet its burden. Appellant argues that it was similarly mislead by defense counsel's statement at the dismissal hearing that the appellee had the burden of proof.
The Supreme Court of Ohio recently reversed the Second District Court of Appeals' decision in Whiting I, holding that it is well settled in Ohio that the state bears the full burden of proving that a pre-indictment delay is justified once the defendant establishes prejudice. State v. Whiting (1998), 84 Ohio St.3d 215,702 N.E.2d 1199 [hereinafter Whiting II]. The Whiting court also found that the trial court did not address the burden of proof until after the hearing on the defendant's motion to dismiss. By then, the state had already had its chance to justify the delay, and it had failed to take advantage of the opportunity. Since the defendant proved he was prejudiced by the delay, and the state made no effort to justify it, the Whiting
court ruled that the defendant was entitled to have the case dismissed.
Appellant claims that the trial court misled it at the hearing on the motion to dismiss because defense counsel stated that the appellee had the burden of proof, and the court did not correct him. Appellant also argues that it is unfair to shift the burden to the state to justify the delay without the court first making a determination or finding that the defendant has met his burden of establishing prejudice to the defense. In light of the decision of the Supreme Court of Ohio in Whiting II, we find appellant's arguments to be without merit.
Ohio law concerning the burden of proof in pre-indictment delay cases has been well settled since Luck. Whiting II, supra.
Assuming, arguendo, that defense counsel misstated the burden of proof at the hearing on the motion to dismiss, appellant was not entitled to rely on such a representation absent a ruling from the trial court on the matter. The court below made no representations to either party regarding the burden of proof in cases involving pre-indictment delay. If the appellant was unsure about the burden of proof, it was not because of an erroneous ruling by the trial court.
Similarly, the court below had no duty to make a preliminary finding that appellee had met his burden of establishing prejudice to the defense prior to this burden of proof being shifted to appellant to justify the delay. After an extensive hearing, at which both parties had a full opportunity to present evidence, the trial court requested that the parties submit post-hearing memoranda to further develop the legal issues involved in appellee's motion to dismiss. Considering the gravity of appellee's motion, it was entirely proper that the trial court thoroughly examine the facts and the law before rendering its decision. We can discern no reason to adopt the de facto bifurcation advocated by appellant, thereby requiring the trial court to issue a partial decision before hearing all of the evidence and fully analyzing all of the legal issues.
Accordingly, the Third Assignment of Error is OVERRULED.
 V.
In its Fourth Assignment of Error, appellant argues simply that the trial court erred in dismissing the indictment. Appellant has not presented any additional argument under this assignment of error, but rather, merely restates its position under the first three assignments of error. We have overruled appellant's first three assignments of error, and its Fourth Assignment of Error is, therefore, equally without merit.
Accordingly, appellant's Fourth Assignment of Error is OVERRULED.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
KLINE, P.J., and ABELE, J.: Concur in Judgment and Opinion.
 ________________________ DAVID T. EVANS, Judge
 NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.
[1] The Luck court noted that its assumption that Luck's story was accurate, for purposes of determining prejudice, did not work to the state's disadvantage because at the same time the court was accepting the state's most damaging, and inadmissible, piece of evidence, i.e. Luck's statement to the police. Id., footnote 5. Similarly, our analysis assumes that Anna's blood is on the sheet taken from the appellee's trailer and that the sheet is connected to her murder.
[2] It is not clear how the sheet could be tied to the murder in 1975. The blood could not be typed due to interference, and DNA testing was not available in 1975.