THE STATE OF OHIO, APPELLANT, *v.* LUCK, APPELLEE.

[Cite as State *v.* Luck (1984), 15 Ohio St. 3d 150.]

(No. 84-138—Decided December 31, 1984.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Carmen M. Marino,* for appellant.

*Gold, Rotatori, Schwartz & Gibbons Co., L.P.A., Mr. Gerald S. Gold* and *Mr. John S. Pyle,* for appellee.

SWEENEY, J. The central issue in this case is whether the trial court properly granted the defendant's motion to dismiss the indictment. The arguments of defendant's counsel in support of the motion to dismiss are (1) that the fifteen-year delay between the commission of the offense and the defendant's indictment therefor has deprived the defendant of her right to a speedy trial under the Ohio Constitution, and (2) that this delay has resulted in actual prejudice to the defendant, thereby violating her right to due process of law.

The defendant's first argument relies heavily on *State* v. *Meeker* (1971), 26 Ohio St. 2d 9 [55 O.O.2d 5], in which we held at paragraph three

of the syllabus that "[t]he [state and federal] constitutional guarantees of a speedy trial are applicable to unjustifiable delays in commencing prosecution, as well as to unjustifiable delays after indictment." Although the Supreme Court subsequently ruled that the speedy trial guarantee under the Sixth Amendment to the United States Constitution has no applicability to pre-indictment delays, *United States* v. *Marion* (1971), 404 U.S. 307, the defendant urges that *Meeker* still is controlling insofar as it applies the speedy trial guarantee under Section 10, Article I of the Ohio Constitution to pre-indictment delay. We agree that *Meeker* was not nullified in its entirety by *Marion,* but we believe that in light of *Marion* and its progeny, our holding in *Meeker* is viable only insofar as its application is limited to cases that are factually similar to it.

In *Meeker,* the defendant committed acts at the same time and place which would have constituted four separate offenses; and, in June 1963, the state knowingly chose to indict the defendant for only one of those four possible offenses. When the defendant's conviction on the 1963 indictment was overturned by a post-conviction order in 1969, the state obtained another indictment charging the defendant with the three other crimes that were committed in 1963. This conduct, which was found to violate the defendant's right to a speedy trial, is distinguishable from the facts of the instant case.

The defendant in *Meeker* initially was indicted in 1963 for one of four offenses that arose from a single sequence of events. His second indictment in 1969 was based upon the three other offenses that arose from that same sequence of events. The defendant's right to a speedy trial under the Ohio Constitution was violated in *Meeker* because the defendant's initial indictment encompassed the same events that were the basis of his second indictment, and the delay in commencing prosecution for the offenses described in the second indictment occurred *after the defendant had already been indicted* for an offense arising from the same sequence of events.

The defendant in the instant case was never indicted for any offense prior to 1983. Therefore, because the defendant herein was not the subject of any official prosecution until 1983, the delay between Tietjen's death in 1967 and the commencement of prosecution in 1983 is not protected by the speedy trial guarantee contained in Section 10, Article I of the Ohio Constitution. The defendant's first argument in support of her motion to dismiss the indictment is therefore without merit.

The second argument offered in support of the defendant's motion to dismiss is that the fifteen-year delay between the offense in question and the commencement of prosecution therefor caused substantial prejudice to the defense and thereby violated the defendant's right to due process. The United States Supreme Court noted in *Marion, supra,* at 324, and later in *United States* v. *Lovasco* (1977), 431 U.S. 783, at 789, that pre-indictment delay resulting in actual prejudice to a defendant "makes a due process

claim concrete and ripe for adjudication." The court also made clear, however, that proof of actual prejudice, alone, will not automatically validate a due process claim, and the prejudice suffered by the defendant must be viewed in light of the state's reason for the delay. *Lovasco, supra,* at 789-790.

The prejudice claimed by defendant Luck to have resulted from the pre-indictment delay in this case consists of the following:

(1) The deaths of two key witnesses, Larry Cassano and Dr. Catalano. Catalano allegedly treated Luck for an injury to her hand on or around October 30, 1967. Cassano was an acquaintance of the defendant and an original suspect in the Tietjen murder case, who, according to Luck's confession to Holmok on the night of her arrest, was present at Tietjen's apartment at the time that she was killed.

(2) The fading of memories and changes in appearance. Specifically, a taxi driver who identified the defendant in 1967 (from a 1962 photograph) as having been a passenger in his cab on October 30, 1967, is no longer able to identify the person who rode in his cab.

(3) The loss of evidence. All of the tape recorded interviews with potential witnesses and suspects that were compiled by the Lakewood Police Department in 1967-1968 have been destroyed. Transcripts of these interviews do not exist.

The defendant urges that the foregoing enumeration of prejudicial factors, when viewed in light of the state's reason for the delay in prosecution of the instant case, warrants dismissal of the indictment on due process grounds. We are unable to reach this conclusion, however, without first determining whether the trial court properly suppressed the defendant's post-indictment confession. Defendant's counsel argues that the alleged confession in this case has no bearing on defendant's motion to dismiss, because this motion is based on the prejudice to the defendant that resulted from *pre*-indictment delay. This argument is flawed, however, because the due process protections afforded in pre-indictment delay cases are protections against the prejudice that a defendant will suffer *at trial.* See *United States* v. *Marion, supra,* at 326; see, also, *United States* v. *MacDonald* (1982), 456 U.S. 1. Thus, the prejudicial factors listed above must be balanced against the other evidence — including the defendant's post-indictment confession — in order to determine whether actual prejudice will be suffered by the defendant at trial.

The "confession" in the instant case consists of statements made to Holmok by defendant Luck on the day of her arrest. Appellee asserts that all of these statements must be suppressed because they were obtained by Holmok as a direct result of the violation of Luck's right to the assistance of counsel under the Sixth Amendment to the United States Constitution. The trial court, after "viewing the entirety of * * * [the] circumstances," concluded that the defendant's right to counsel had been violated and granted the defendant's motion to suppress. We are in complete agreement with the trial court's determination.

As set forth in the facts of this case, above, defendant Luck, immediately after her arrest, requested her husband to contact an attorney on her behalf. Holmok, who was one of the arresting officers, was well aware of Mrs. Luck's request when he later accepted Duff's phone calls at the Lakewood Police Station. Holmok told Duff that he could not speak to Mrs. Luck on the phone; and, despite his knowledge of Luck's desire to retain counsel, Holmok deliberately elicited incriminating statements from Luck without telling her that her husband had retained Duff as her attorney.[1] This behavior, when coupled with Holmok's assurances to Duff that he would not talk to or interrogate Mrs. Luck, amounts to active deception that is clearly violative of Luck's right to counsel.

The state argues, in effect, that Holmok's conduct is not relevant to the admissibility of the statements in question because Luck waived her right to counsel both during her "booking" and immediately after her "processing." This argument is without merit. The review required by *Johnson* v. *Zerbst* (1938), 304 U.S. 458, 464, of "the particular facts and circumstances surrounding * * * [the] case, including the background, experience, and conduct of the accused," reveals that the state has failed to carry its burden of proving that the defendant "knowingly and intelligently" waived her right to counsel. See *Brewer* v. *Williams* (1977), 430 U.S. 387, at 402-405.

The record reveals that Mrs. Luck was at home with her children when arrested pursuant to an indictment obtained in a secret grand jury proceeding. After her arrest, Mrs. Luck became physically ill and vomited at least twice before her arrival at the Lakewood Police Station. Once at the station, she was "booked" by Patrolman Murray of the Lakewood Police Department. The audio tape of this "booking procedure" reveals that Mrs. Luck was still not feeling well at that time.[2]

During the booking, Murray read an "Advice of Rights"[3] form to Mrs.

---

[1] As discussed in the facts of this opinion, Detective Holmok, by his own testimony, was more than a passive listener in his five-hour "conversation" with Mrs. Luck. Holmok used interrogation techniques designed to help Mrs. Luck "unburden herself" to him, and Luck's most incriminating statements were made subsequent to Holmok's use of these techniques. There is no question that Detective Holmok deliberately elicited a confession from Mrs. Luck. See *Brewer* v. *Williams* (1977), 430 U.S. 387.

[2] While Patrolman Murray was typing Luck's "booking record," an unidentified male voice said to Mrs. Luck, who had choked during her response to one of Murray's questions, "Are you gonna be sick?" Some inaudible conversation took place and then the male voice, apparently speaking to another individual in the room, said, "Yea, she's gonna get sick again."

[3] The "Advice of Rights-Adult" form stated:
                              "YOUR RIGHTS
"BEFORE we ask you any questions, you must understand your rights.
"YOU have the right to remain silent.
"ANYTHING you say can be used against you in Court.

Luck, and he asked her to mark a "YES" and sign her name on the form if she understood her rights. Murray then read the "Waiver of Rights"[4] portion of the form to Luck and asked, "Do you understand that?" At that point the following discussion took place:

Luck: "Do I sign there?"

Murray: "It's up to you. Do you understand what it means?"

Luck: "Yea, I understand —"

Murray: "What it means is you've read your statement of your rights up here —"

Luck: "Right, yes —"

Murray: "You understand what your rights are. The right to an attorney. The right to remain silent. The right to talk without an attorney present if you want. OK? That no-one here is forcing you to answer any questions without your attorney here. If you want to answer questions, fine. If you want your attorney, tell him. He'll stop asking the questions. You can call your attorney. That's all it means right there —"

Unidentified male voice: "No-one's forcing you —"

Luck: "No."

Murray: "By any means."

Luck: "Alright."

Murray: "OK."

Luck: "Do you want me to sign it?"

Murray: "If you wish."

Luck: "Do I —?"

Murray: "We can't advise you on what you can and can't do."

---

"YOU have the right to talk to an attorney for advice before we ask you any questions and to have him with you during questioning.

"IF you cannot afford an attorney, one will be appointed for you before any questioning if you wish.

"IF you decide to answer questions now, without an attorney present, you will have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to an attorney. Further you have the right to have an attorney present during any questioning.

"DO YOU UNDERTAND THIS?

"Answer <u>Yes</u> Signature <u>KATHERINE LUCK</u>"

[4] The "Waiver of Rights" form stated:

### "WAIVER OF RIGHTS

"I have read this statement of my rights and understand what my rights are. I am willing to make a statement and answer questions. I do not want an attorney at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

"Signature <u>Katherine Luck</u>

"WITNESS <u>Capt. Glen P. Walker</u>

"WITNESS <u>Ptl. Murray</u>

"Time <u>1916</u>"

Luck: "I don't — I don't know."

Murray: "OK, we're not going to talk to you here anyway. It's just a formality. I have to advise you of your rights. The officer on your right, to the rear of you there, is Captain Walker. The matron here is Matron Keene, and I'm Patrolman Murray the booking officer. Just so you know who we are here, OK?"

Mrs. Luck apparently then signed the "Waiver" form and the booking procedure continued. This signature, however, cannot reasonably be construed as a "knowing and intelligent waiver" of her right to counsel. Mrs. Luck was feeling ill and apparently was highly agitated by the events of the previous hour. Murray's explanation of the import of the "Waiver" form is clearly inadequate, and Mrs. Luck's hesitation in signing the waiver was apparently eased only after Murray advised her that "we're not going to talk to you here anyway. It's just a formality."

Based on the foregoing, it is indisputable that Luck did not knowingly and intelligently waive her right to counsel prior to the first four calls by Duff to the Lakewood Police Station. For this reason, we need not consider whether Mrs. Luck's second "waiver," which occurred at 9:05 p.m. (after Duff's fourth call but before his fifth and final call), was knowingly and intelligently made. We note, however, that Mrs. Luck was kept "in the dark" as to Duff's calls on her behalf. These calls were placed in response to Mrs. Luck's request for counsel, as made through her husband, and it is highly unlikely that *any* waiver made subsequent to the receipt of these calls by the Lakewood Police Department could be considered to be knowing and intelligent. See *Commonwealth* v. *McKenna* (1969), 355 Mass. 313, 244 N.E. 2d 560.

Thus, having determined that the defendant's confession was obtained in violation of her Sixth Amendment right to counsel, we return to the two-part test required in cases of pre-indictment delay. The prejudicial factors enumerated by defense counsel (the deaths of witnesses, the fading of memories, and the loss of evidence), when balanced against the other admissible evidence in this case, show that the defendant has suffered actual prejudice by the fifteen-year delay in prosecution. Although the state is in possession of circumstantial evidence which may link the defendant to Tietjen's death, it cannot be said that the missing evidence or the dead witnesses would not have minimized or eliminated the impact of the state's circumstantial evidence. Specifically, Holmok's report of his "conversation" with the defendant on the night of her arrest states that Mrs. Luck said that Larry Cassano "was the one person who could have helped her in this matter but he is dead." Luck further stated to Holmok that Cassano was with her in Tietjen's apartment at the time that Tietjen was killed.

Luck's account of Tietjen's killing, as "confessed" to Holmok, indicates that Tietjen physically attacked Luck and that Tietjen was killed in the ensuing fight. Assuming that this "confession" is an accurate descrip-

tion of the events leading up to Tietjen's death,[5] the defendant Luck is obviously prejudiced by not being able to seek verification of her story from Cassano and thereby establish mitigating factors or a defense to the charge against her.

Having found actual prejudice to the defendant, we turn to the second part of the test set forth in *United States* v. *Lovasco, supra,* which requires that there be no justifiable reason for the delay in prosecution that caused this prejudice. On this point, the state contends that it appears that there was, in 1967, at least a police error in judgment as to whether this case should have been submitted to the prosecutor's office. Following this alleged "error in judgment," the Lakewood Police Department ceased its active investigation into Tietjen's death. Fifteen years later, the prosecutor sought an indictment based upon the same evidence that had been available in 1968.[6] In fact, the deaths of witnesses and the loss of taped interviews had significantly *reduced* the available evidence by the time that the prosecutor sought the indictment of Mrs. Luck.

This court will not assume the role of the prosecutor to determine when there is sufficient evidence to seek an indictment in every case; and we agree with the rationale of *United States* v. *Lovasco, supra,* at 792, that it would be unwise to adopt a rule requiring the commencement of prosecution whenever there is "sufficient evidence to prove guilt beyond a reasonable doubt." We believe, however, that a delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant, see *United States* v. *Marion, supra,* or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased. The length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable.

In the instant case, the state delayed prosecuting the defendant because of an alleged "error in judgment," which lead to a halt in the Lakewood Police Department's active investigation of Tietjen's death. This investigation remained at a stand-still for approximately fifteen

---

[5] Our assumption, for the purposes of determining whether the defendant will be prejudiced at trial by Cassano's unavailability as a witness, does not work to the disadvantage of the state, because, in making this assumption, we are accepting "at face value" the most damaging piece of evidence that was obtained by the state against the defendant.

[6] At the hearing on the defendant's motions to suppress and dismiss, counsel for the defendant asked Holmok the following question: "But other than the scientific evidence that was gathered at the scene and evaluated then and later, is there anything that has happened in 15 years prior to the indictment that changes the case that they had in 1967?"

Holmok's response to this question was, "No, sir, there is not."

years. During that time, witnesses died, memories faded, and evidence was lost. When the state finally decided to commence its prosecution of the defendant herein, it did so without one shred of new evidence — its case being substantially the same as it had been since 1968. For these reasons, we find that the pre-indictment delay in the instant case is unjustifiable.

The delay in the commencement of prosecution against Katherine Luck "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' * * * and which define 'the community's sense of fair play and decency.' * * *'' *United States* v. *Lovasco, supra,* at 790 (citations omitted). We find that this delay is unjustifiable, has resulted in actual prejudice to the defendant, and will effectively deprive the defendant of her right to due process of law under Section 16, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution should this case proceed to trial.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

CELEBREZZE, C.J., W. BROWN, LOCHER, C. BROWN and J. P. CELEBREZZE, JJ., concur.

HOLMES, J., concurs in judgment only.