DECISION
On May 28, 1998, defendant-appellant, Josephine A. Slaughter, was indicted on one count of aggravated murder, in violation of R.C. 2903.01, for the murder of Kathleen F. Davis on May 29, 1981, almost seventeen years earlier. After a jury trial, appellant was found guilty and sentenced to a term of twenty years to life of imprisonment. Appellant filed a notice of appeal and raises the following assignments of error:
ASSIGNMENT OF ERROR I
 THE TRIAL COURT COMMITS REVERSIBLE ERROR BY DENYING APPELLANT'S ATTORNEYS THE OPPORTUNITY TO CROSS EXAMINE PRINCIPAL OFFENDER ON HIS HOSPITALIZATION FOR MENTAL HEALTH ISSUES, IN VIOLATION OF APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND EVIDENCE RULE 608(A).
ASSIGNMENT OF ERROR II
 THE TRIAL COURT COMMITS REVERSIBLE ERROR BY ALLOWING TESTIMONY OF OTHER ACTS WHOSE PREJUDICIAL NATURE OUT WEIGHED THEIR PROBATIVE VALUE, THEREBY DENYING APPELLANT HER RIGHT TO A FAIR TRIAL IN VIOLATION OF THE STATE AND FEDERAL CONSTITUTIONS.
ASSIGNMENT OF ERROR III
 REVERSIBLE ERROR OCCURS WHEN A STATE'S WITNESS TESTIFIES ABOUT DEFENDANT'S SON BEING ON TRIAL FOR AGGRAVATED MURDER, IN VIOLATION OF APPELLANT'S RIGHT TO A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS.
ASSIGNMENT OF ERROR IV
 APPELLANT'S DUE PROCESS RIGHTS WERE VIOLATED, DUE TO THE DELAY BETWEEN THE ALLEGED CRIME AND INDICTMENT, UNDER THE STATE AND FEDERAL CONSTITUTIONS REQUIRING A DISMISSAL OF THE CHARGE OF AGGRAVATED MURDER WITH PREJUDICE.
On May 30, 1981, Davis, a seventy-nine-year-old woman, was found dead in her bathtub in approximately twelve inches of water. Appellant was a close friend of Davis and often helped Davis with tasks around the house, especially with the dogs that Davis owned and sold. Appellant was the executrix and sole beneficiary of Davis' will.
At the trial, a number of witnesses testified for the prosecution and the following is an abbreviated summary of the testimony of the essential witnesses. One of the first witnesses was Kathy Messenger, who was appellant's former sister-in-law. Messenger had been married to Steve Smith, appellant's brother. Messenger testified that she was terrified of Smith because he was mentally abusive towards her and he continually threatened her children. Messenger testified that Smith carried a .357 magnum and robbed places to gain more money. She was aware of a plan between appellant and Smith to kill Davis.
On May 29, 1981, she believed that she and Steve were going to eat dinner when, instead, they arrived at 897 Rarig Avenue, Davis' home. When they went inside and saw appellant, Messenger knew what was to happen. She testified that Smith went into the bathroom and she heard a woman's voice say, "Oh, my God." She went into the kitchen to get a drink and appellant told her not to touch anything.[1] She then went into the hallway outside of the bathroom and saw Smith kneeling behind a woman. She went into the kitchen and heard bath water running. Smith called to appellant that he needed help putting Davis into the bathtub. Then Smith and appellant came into the kitchen and Smith asked appellant whether she had taken care of "the other?" Appellant replied, "yes" and told Smith that she had pushed in a window from the outside and made it look like a robbery. Appellant was wiping things down to remove fingerprints. Then the three of them left and went home. Messenger testified that she told the police in 1981 that she did not know anything about the murder because she was afraid of the threats from Smith. However, in 1998 when the police were investigating the murder again, she cooperated because she was "tired of living with it" and she "just wanted it to be done and over with."
Steve Smith then testified for the prosecution. He had pled guilty to breaking and entering and involuntary manslaughter and was serving a ten-year sentence for this murder. He testified that he had strangled Davis because appellant offered him $5,000 to kill her. Appellant was the beneficiary in Davis' will and she stated she would sell Davis' house to give him the money. While his testimony as to the events was substantially the same as Messenger's, there were inconsistencies. He testified that he, Messenger and appellant traveled to Davis' house together. Once inside, he asked Davis for some aspirin and followed her into the bathroom. There he strangled her with an extension cord he had inside his pocket. He testified that he put Davis in the bathtub and turned on the water. He stated that he went outside to smoke a cigarette, and Messenger and appellant came outside approximately twenty minutes later and they left. He drove appellant to her house, and then he and Messenger returned to their home. Smith also testified that appellant was experiencing financial strain because she was trying to pay the legal bills of her son, Robert. He stated that he cooperated with the police because he was "tired of living with it" and that is why he "decided to tell the truth."
Forest Sharpe testified that he had been married to appellant. He testified that Davis had been in the hospital just prior to her death. While she was in the hospital, appellant used Davis' credit card to buy a suit for her son, Robert. He testified that appellant did not have permission to use the card. He overheard a telephone conversation between appellant and Smith concerning killing Davis while she was in the hospital. On May 29, 1981, he and appellant went to Davis' house because Davis was not feeling well and appellant was going to spend the night with her. When he was leaving around 10:00 p.m., he saw Smith arriving. He testified that appellant returned to their home around 12:30 or 1:00 a.m. on May 30, 1981; however, he and appellant returned to Davis' house at approximately 7:30 a.m. on May 30, 1981, to check on Davis and to feed the dogs and found Davis' body. Sharpe also testified that appellant was experiencing financial pressure from her favorite son's legal problems.
The chief magistrate for the Franklin County Court of Common Pleas, Probate Division, testified that Davis' will was admitted to the probate court and appellant was the executrix and sole beneficiary of the will. The coroner testified that an autopsy revealed that the cause of Davis' death was ligature strangulation.
Two defense witnesses testified. One had known Steve Smith for years and testified that Smith's reputation was that he was untruthful and a con man. A close friend of appellant testified that she was involved in a three-way telephone conversation involving appellant and Smith. She heard Smith tell appellant that "you should have been with me, he said, the night I put an extension cord around an old woman's neck and tightened it up. He said, that's the biggest high I ever had." However, Smith denied having made the statement.
By the first three assignments of error, appellant contends that the trial court erred in its rulings on evidentiary issues: by excluding evidence of Smith's hospitalization for mental health issues; and by permitting testimony by Sharpe that appellant used Davis' credit card without authorization and by permitting Sharpe to testify that the financial pressure appellant was facing was due to the legal bills of appellant's son, Robert, who was facing murder charges.[2]
The trial court has broad discretion in the admission or exclusion of evidence and, in the absence of an abuse of discretion which results in material prejudice to a defendant, an appellate court should be slow to reverse evidentiary rulings. Krischbaum v. Dillon (1991), 58 Ohio St.3d 58,66. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
Even if appellant is correct, that the trial court erred in all three rulings, the errors are harmless given the testimony of Messenger and Sharpe. "Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless `beyond a reasonable doubt' if the remaining evidence alone comprises `overwhelming' proof of defendant's guilt." State v. Williams (1983),6 Ohio St.3d 281, 290, quoting Harrington v. California (1969),395 U.S. 250, 254.
Both Messenger and Sharpe testified that there was a conspiracy between appellant and Smith. Messenger was present at the time of the murder and implicated both Smith and appellant. This evidence constitutes overwhelming proof of appellant's guilt and the trial court rulings are harmless. Appellant's first three assignments of error are not well-taken.
By the fourth assignment of error, appellant contends that her due process rights were violated due to the delay between the alleged crime and the indictment. The murder occurred on May 29, 1981, and appellant was indicted on May 28, 1998. The Supreme Court of the United States has determined that a pre-indictment delay does not violate due process rights unless the delay results in actual prejudice to the defendant.United States v. Marion (1971), 404 U.S. 307. In State v. Luck (1984),15 Ohio St.3d 150, 154, the Supreme Court of Ohio held that the prejudice suffered must be viewed in light of the state's reason for the delay. InUnited States v. Lovasco (1977), 431 U.S. 783, the court held that a court must find actual prejudice to the defendant and that there was no justifiable reason for the delay before an indictment is dismissed.
Appellant argues that she suffered actual prejudice by the delay because the lead detective in the initial investigation had died; the grand jury testimony of three witnesses had been destroyed or lost; a person identified by appellant as a possible suspect died; the actual notes of some of the interviews may not exist; the witnesses to Davis' will were unavailable; and Forest Sharpe's mother, a potential witness for impeachment purposes, had died.
Most of the asserted prejudice does not constitute actual prejudice but, rather, is speculative. As to the grand jury testimony of three witnesses referenced in appellant's brief, none of the three testified at trial. The death of a possible suspect, mentioned only by appellant, is not prejudicial given the evidence of Messenger and Smith. There is nothing to suggest the testimony of Forest Sharpe's mother would have impeached him. The death of the lead detective, if prejudicial, was probably more prejudicial to the prosecution than appellant. The witnesses to Davis' will being unavailable is irrelevant since the circumstances surrounding the making of the will were not at issue. Thus, the asserted prejudice does not constitute actual prejudice.
Even assuming these factors constitute actual prejudice, the second part of the test requires us to determine whether the state had a justifiable reason for the delay. Appellant argues that this case is similar to Luck. However, in Luck, the fifteen-year delay was due to negligence or an error in judgment on behalf of the police investigators in failing to submit the case to the prosecutor's office. When an indictment was eventually sought, it was based on the same evidence available to the state fifteen years earlier. The court in Luck
determined that a delay to intentionally gain a tactical advantage over the defendant, negligence, or an error in judgment may constitute an unjustifiable delay depending upon the length of the delay. In Luck, the court found the delay unjustifiable because an alleged error in judgment on behalf of the police investigators caused a fifteen-year delay, two key witnesses had died, memories had faded and all of the tape recorded interviews were lost.
In this case, the two main prosecution witnesses, Messenger and Smith, would not cooperate or testify in 1981, but then agreed to cooperate and testify in 1998. The presence of this additional evidence, previously unavailable to the state, presents a justifiable reason for the delay. Thus, this case differs from Luck. Appellant's fourth assignment of error is not well-taken.
For the foregoing reasons, appellant's four assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
TYACK and PETREE, JJ., concur.
[1] Although on cross-examination she testified it may have been Smith who told her not to touch anything. (Tr. Vol. II, 31.)
[2] While appellant argues that the testimony was from her ex-husband, Sharpe, the testimony was from her brother, Smith. (Tr. Vol. II, 93.)