STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 12 MA 162 |
| | ) | |
| PLAINTIFF-APPELLANT | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| DANIEL WINKLE | ) | |
| | ) | |
| DEFENDANT-APPELLEE | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 12 CR 393

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellant: Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman Street, 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellee: Atty. John B. Juhasz
7081 West Blvd., Suite 4
Youngstown, Ohio 44512

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated: March 5, 2014

WAITE, J.

{¶1} The State of Ohio appeals the dismissal of rape and gross sexual imposition charges filed against Appellee Daniel A. Winkle.  In 2002, Appellee was briefly investigated due to an accusation that he had sexually assaulted his daughter R.W. sometime between 1994 and 1996.  She would have been five or six years old at the time.  There was no physical evidence in this case, no scientific evidence such as DNA analysis, and no independent witnesses corroborating the story.  At some point, the victim's mother reported that her daughter would no longer cooperate with the investigation.  Although the child herself was not questioned and there was another suspect in the case who was never investigated, the case was closed due to lack of evidence in 2003.  It was reopened in 2012, when the victim stated that she recently remembered Appellee talking to family members about the assault. Appellee was indicted on multiple counts of rape and gross sexual imposition. Appellee filed a motion to dismiss for preindictment delay and the motion was granted, leading to this prosecutor's appeal.  The state argues that the trial judge erred in dismissing the charges because Appellee was not prejudiced by the delay and because there was new evidence supporting the delayed indictment.

{¶2} There are two primary issues involved when preindictment delay is raised:  whether the defendant was actually and substantially prejudiced by the delay in prosecution, and whether the state had a justifiable reason to explain the delay in prosecution.  Depending on the reason given for the delay, the length of the delay can also become a determining factor.  In this case, Appellee proved to the trial court that he was actually and substantially prejudiced by the delay due to the destruction

or loss of many evidentiary records. These records would primarily be used to undermine the victim's credibility and to provide an alibi. The state also failed to present a justifiable reason for the delay. Although the state alleges that it has recently procured a telephone confession, this supposed new evidence was not produced at the dismissal hearing. The state also claimed it had new evidence of an admission made by Appellee to his son in 2003, but this evidence cannot be treated as new evidence and was also not produced at the hearing. Because the record here reveals no new evidence, the nine-year delay in prosecution became a determining factor. The trial court considered that the length of delay amounted to a violation of Appellee's due process rights, and we agree. The state has not established any precedent to support a finding of justifiable delay when the state failed to investigate various aspects of the case, closed it due to the absence of evidence, did nothing on the closed case for nine years and then, to justify the delay, alleges the existence of new evidence without producing such evidence at the hearing on the motion to dismiss. The trial court did not err in dismissing the indictment, and the judgment of the trial court is affirmed.

Case History

**{¶3}** In 2002, R.W. was interviewed at the Child Advocacy Center regarding alleged sexual assaults. The interview was recorded on video and Detective Cherry Cappabianca of the Mahoning County Sheriff's Department, who was assigned to investigate the case, viewed the videotape. (Tr., p. 69.) The victim apparently accused Appellee of sexually assaulting her at night, while her mother was away at work, taking the child from her private bedroom to the marital bedroom on the second

floor. Detective Cappabianca interviewed Appellee and the child's mother. Appellee denied the sexual abuse allegations. The sexual assault examination of R.W. was negative. Shortly thereafter, mother said that R.W. was "shutting down" and would no longer talk about the events. Detective Cappabianca did not try to interview R.W. personally, and did not investigate any other possible suspects, even though there was a report that a neighbor boy may have been the attacker and even though the basis for the sexual assault investigation was R.W.'s report that it had occurred. Due to the absence of physical or DNA evidence and the lack of any witnesses, the investigation was closed for lack of evidence in January of 2003. (Tr., pp. 72, 88.)

{¶4} In January, 2012, Detective Terry Martin of the Mahoning County Sheriff's Department received a call from Ms. Bilal, who was counseling R.W. at the time. R.W. told her counselor that she remembered Appellee talking to his son in March of 2003 about the attack. Detective Martin contacted the son, who apparently told him about alleged admissions made by Appellee in 2003. The exact nature of these admissions is not in the record. Based on this information, Detective Martin set up a "cold call" between R.W. and Appellee that was recorded without Appellee's knowledge. Supposedly, Appellee discussed the assaults during that call. No recording or transcript of the call is in the record. Appellee was then indicted on five counts of rape and five counts of gross sexual imposition on April 19, 2012. The time period of the alleged attacks was June 25, 1994, through June 25, 1996.

{¶5} On July 13, 2012, Appellee filed a motion to dismiss the charges on the basis of preindictment delay. An evidentiary hearing was held on the motion on July 26, 2012.

{¶6}    Appellee testified that he attempted to locate many records relating to the alleged time period of the attacks between 1994 and 1996.  He was involved in sleep apnea studies during that time period in which he was required to sleep on the downstairs couch, which would contradict the victim's allegation that the attacks took place in the second floor marital bedroom.  (Tr., p. 14.)   These studies were performed by Eastern Ohio Pulmonary Consultants (EOPC), and mother was an independent contractor working for EOPC.  Appellee was able to locate only one record from EOPC indicating that he was involved in a sleep study in December of 1995.  He found one record from a doctor, Dr. Politis, who interpreted an overnight sleep study record from January, 1996.  He also had a letter from Dr. Politis, dated in 2001, that referenced the sleep study.  These are the only records he was able to recover from EOPC or that related to the sleep study.  (Tr., p. 21.)

{¶7}    Appellee attempted to locate records from Northside Medical Center about these sleep studies.  Mother was actually the custodian of the Northside Medical Center records.  She could not find any records other than the documents already discussed.

{¶8}    Appellee tried to obtain records from Boardman Medical Supply regarding a BiPAP breathing machine that was supplied for his sleep studies.  The dates that he used the breathing machine could have established the time period he was sleeping on the couch rather than in the marital bedroom.  Boardman Medical Supply could not locate these records.

{¶9}    Appellee contacted his former personal doctor, Dr. Might, for records of his sleep studies or anything related to EOPC, but the doctor, who had retired, could

not provide any records. Dr. Might's records had been transferred to Dr. Shina, but Dr. Shina also could not locate these records.

**{¶10}** Appellee searched for records verifying that mother was working the day shift during that time period. Therefore, she would have been home at night during the time of the alleged attacks, which would directly contradict the victim's allegations. He discovered that those records no longer exist. Youngstown Osteopathic Hospital, where mother was formerly employed, had closed many years ago. There were no longer work records from EOPC, itself.

**{¶11}** Appellee testified that he and the victim's mother had kept family calendars that contained information such as doctor appointments and work schedules, but those calendars had been disposed of a few years ago. Appellee testified that he had kept records of home renovations that would have shown when a new bedroom had been built in their home. This evidence could contradict the victim's testimony that she was sleeping alone in her own bedroom when the attacks happened, because Appellee believes that the girl shared a bedroom with her sister and that the home renovation did not take place until sometime between 1997 and 1999, after the alleged time period of the attacks. The renovation records no longer exist.

**{¶12}** Appellee also established that his own memory had dimmed considerably over the years as to the events not only from 1994-1996, but also regarding the brief investigation in 2002-2003.

**{¶13}** Mother testified that she was employed as a technologist of sleep studies, and had worked both at Youngstown Osteopathic Hospital and as an

independent contractor for EOPC.  She had no records of her employment with Youngstown Osteopathic Hospital.  She could not remember if she performed sleep studies at night while patients were sleeping, but her invoices from EOPC would show her work hours.  She could not find any of those invoices.  She did not remember which nights Appellee slept on the couch.  She did not remember the dates that Appellee used the BiPAP breathing machine.  She remembered that for a period of time her children slept on the second floor and Appellee slept on the first floor couch, but not the exact dates.  She remembered that her daughters shared a bedroom until the house was renovated, but not the year when the house was remodeled.

{¶14} Detective Cappabianca, who investigated the case in 2002-2003, testified that some records and notes about the case no longer existed, but that there might be other notes in the case file.  (Tr., p. 76.)  None of these notes or records were produced at the hearing.  The detective stated that in 2002, she was in charge of investigating the allegations in this case.  In September of 2002, she received a referral from Children Services regarding R.W.  The detective viewed a video of R.W. made by Gloria Sanchez of Children Services.  The detective then contacted Appellee, and he came to her office for an interview.  He denied the allegations.  Detective Cappabianca stated that there were no eyewitnesses, no DNA evidence, and no other physical evidence.  (Tr., p. 71.)  The victim's mother told the detective that R.W. "was shutting down" and did not want to talk about the allegations any longer.  (Tr., p. 72.)  There is no record of this conversation between Cappabianca and the victim's mother.  The detective made no effort to confirm the victim's story or

confirm that the child was shutting down or was no longer willing to cooperate with the investigation. (Tr., p. 76.) The case was closed in January of 2003 due to lack of evidence. (Tr., p. 72.)

{¶15} Detective Terry Martin testified that he spoke to R.W. in January, 2012. This interview was not recorded. R.W. told him that she had learned that Appellee had previously disclosed to other family members, including her brother, "that he did these things to me". (Tr., p. 79.) Martin reviewed the case file, which consisted of a one-page report from Detective Cappabianca, a recorded interview of R.W. from 2002, and a recorded interview of Appellee from 2002. He did not review any records from Children's Services. Detective Martin testified that the victim agreed to have the police record a telephone call between herself and Appellee. Martin's testimony is as follows:

Q [Prosecutor] And is a cold call when she would call her father and you would be recording?

A Engage him in a conversation and open that conversation up where they would talk about her sexual abuse.

Q And did that phone call take place?

A Yes, it did.

Q And were there admissions made by the Defendant --

A There were.

Q -- regarding the sexual abuse?

A A number of admissions.

(Tr., p. 80.)

**{¶16}** Detective Martin also testified that he spoke to Appellee's son about the case, and the son stated that Appellee made some type of admission about the attacks. Martin testified as follows on direct examination:

Q [Prosecutor] And did you also speak to the Defendant's son, Daniel Winkle, Jr.?

A I did.

Q And did he tell you about any admissions that his father had made to him about the sexual abuse?

A He did.

(Tr., p. 80.)

**{¶17}** On cross-examination, Detective Martin stated that Appellee supposedly made the admissions to his son in March, 2003. Daniel Winkle, Jr., did not testify at the hearing, and no transcript or any other evidence of the alleged conversation with Daniel Winkle, Jr. was provided, other than Detective Martin's testimony. Although Appellee allegedly told the victim's mother, grandmother and his son about the abuse, the police only contacted the son. Martin stated that he interviewed the victim, who told him that Appellee said he told other family members "that he did these things to her," and that he "asked for her to forgive him." (Tr., p. 85.) Detective Martin did not record this conversation with the victim. (Tr., p. 86.) Martin could only say that "I may have taken some handwritten notes. I don't remember." (Tr., p. 86.) No notes about the interview were produced.

**{¶18}** Detective Martin was aware that there was evidence in 2002 that a neighbor boy by the name of Pitts may have attacked R.W., but the police never

investigated this possibility. (Tr., p. 87.) The police apparently believed, without further investigation, that the story about the neighbor was fabricated by Appellee. (Tr., p. 88.) Detective Cappabianca stated that she could not remember any allegations against a neighbor and did not investigate the matter.

{¶19} On August 27, 2012, the trial court sustained Appellee's motion to dismiss. The court noted that the case had been closed for nearly 10 years, and that the indictment concerned events that occurred 16 to 18 years ago. The court stated that while the case had allegedly been reopened due to new evidence, the "new evidence" was supposedly admissions made by Appellee to his son in 2003. The court did not consider this to be new evidence. The court noted that the state was informed about a possible neighbor as a suspect but had never investigated the matter, even though it had the suspect's name. The court found that Appellee had diligently attempted to locate records to prepare his defense, that the records were necessary to provide an alibi and to challenge the credibility of the victim, and that only a small portion of the records could be found. The court found that Appellee was prejudiced by the unavailability of records, that his possible defense was crippled and perhaps completely destroyed, and that the unavailability was caused by the state's inexplicable and unjust delay in prosecuting the case. The court held that the preindictment delay was "so obvious and egregious that it is an affront to the face of justice." (8/27/12 J.E., p. 3.) The court found that the state "failed to produce evidence of any justifiable reason for this unbelievably lengthy and consequently prejudicial delay." (8/27/12 J.E., p. 3.) The court then sustained the motion to dismiss. This timely prosecutor's appeal followed.

## ASSIGNMENT OF ERROR

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DISMISSED DEFENDANT'S INDICTMENT AFTER IT: ARBITRARILY AND UNREASONABLY IGNORED THE FACT THAT THE STATE DISCOVERED NEW EVIDENCE JUST MONTHS BEFORE HE WAS INDICTED; ERRED IN FINDING THAT DEFENDANT SUFFERED SUBSTANTIAL PREJUDICE FROM THE DELAY; AND FAILED TO FIND THAT THE DELAY WAS UNJUSTIFIED BASED UPON THE INTENTION TO GAIN A TACTICAL ADVANTAGE, OR RESULTED FROM AN "ERROR IN JUDGMENT" OR NEGLIGENCE.

{¶20} In this appeal, Appellee alleged that the charges should be dismissed due to preindictment delay, and the trial court agreed. The state is now arguing that the charges should not have been dismissed because it had uncovered new evidence, because Appellee was not prejudiced by the delay, and because the state was not at fault in creating the delay.

{¶21} A defendant's due process rights can be violated by preindictment delay under certain circumstances. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). "An unjustifiable delay between the commission of an offense and a defendant's indictment therefor, which results in actual prejudice to the defendant, is a violation of the right to due process of law * * *." *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus. Courts

apply a two-part test to determine whether preindictment delay constitutes a due process violation. The defendant has the initial burden to show that he was substantially and actually prejudiced due to the delay. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998); *State v. Kemp*, 8th Dist. No. 90029, 2013-Ohio-167, ¶28. The burden then shifts to the state to produce evidence of a justifiable reason for the delay. *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829. Thereafter, the due process inquiry involves a balancing test by the court, weighing the reasons for the delay against the prejudice to the defendant, in light of the length of the delay. *Id.* at ¶51, citing *United States v. Lovasco, supra*.

**{¶22}** In reviewing preindictment delay, the determination of actual or substantial prejudice entails "a delicate judgment based on the circumstances of each case." *Walls*, 96 Ohio St.3d 437, at ¶52. The court must consider the evidence against the defendant as it exists at the time the indictment is filed to ascertain whether the delay will actually prejudice his trial. *Id.*; *Luck*, 15 Ohio St.3d at 154. To show prejudice, the defendant must raise issues arising from the delay that could be considered more than merely "somewhat prejudic[ial]." *Walls* at ¶56. In *Luck*, there was evidence that the victim attacked the defendant and was killed in the ensuing fight, but a witness who could corroborate this version of the events died during the delay in prosecution. This was enough to establish actual and substantial prejudice and to result in dismissal of the charges. *Luck* at 157-158.

**{¶23}** A trial court's decision on a motion to dismiss for preindictment delay is reviewed *de novo* with respect to the legal issues, but the findings of fact made by

the trial judge are afforded great deference on appeal. *State v. Wade*, 8th Dist. No. 90029, 2008-Ohio-4574, ¶45.

{¶24} In the instant matter, the state's case depends on the credibility of the victim. Her credibility will be weighed in light of the fact that she is trying to recollect events that occurred 16-18 years ago, and in light of the brief investigation that took place in 2002. The state has conceded that actual and substantial prejudice may be found based on loss of evidence that could be used solely to impeach the credibility of the victim or other witnesses. Appellee provided a wide array of potential evidence that is no longer available that he believes would have directly contradicted key aspects of the victim's story or could have provided an alibi. Appellee was no longer able to prove that he was involved in a sleep study, that he slept on the couch rather than in the upstairs bedroom, and that his wife did not work the night shift when the crimes allegedly occurred. He was also unable to contradict part of R.W.'s story that she had a private bedroom when the crimes occurred, because house renovation records were no longer available to show that she shared a bedroom with her sibling until years after the date of the alleged crimes. Hospital records, invoices, tax records, personal calendars, employment records, medical equipment records had all been lost or destroyed during the delay in prosecution.

{¶25} Although Appellee and the victim's mother, who would be key witnesses in the case, both testified as to their failing memory of the events of the prior 18 years, this is certainly not a case in which the defendant is relying primarily on vague assertions that witnesses' memories have faded or that evidence has spoiled due to the mere passage of time. When a defendant is solely relying on the

mere passage of time and generalized deterioration of evidence and witness memories, courts normally do not find that a defendant has been actually and substantially prejudiced by the delay. *See, e.g., State v. Glasper*, 2d Dist. No. 15740, 1997 WL 71818 (Feb. 21, 1997). In this case, though, Appellee was very specific about the evidence that was lost and the effect the lost evidence would have at trial.

**{¶26}** The hearing on a motion to dismiss for preindictment delay is an evidentiary hearing. The purpose of the hearing is to determine whether the evidence of prejudice, when balanced against the evidence to be used by the state, reflects that actual and substantial prejudice will be suffered by the defendant at trial. *Luck* at 154. If the defendant produces evidence of actual and substantial prejudice, the state cannot overcome a motion to dismiss by simply stating that the defendant is not substantially prejudiced by the delay. The state must cite to other evidence that establishes lack of prejudice or that any prejudice does not outweigh the reasons for the delay. "[I]n a case such as this one, with a lengthy preindictment delay and a significant amount of lost evidence, if the state fails to make a sufficient record to rebut the defendant's showing of prejudice, it does so at its own peril." *State v. Brown,* 4th Dist. No. 98CA25, 2000 WL 303142, at *9 (Mar. 17, 2000).

**{¶27}** The state argues that Appellee's lost evidence, at best, constitutes only a partial alibi or may partially impeach the victim's testimony. Thus, they claim, it does not create substantial prejudice. We disagree with this assessment. Particularly as to the impeachment value of the lost evidence, it is apparent that such evidence could undermine several aspects of the victim's testimony. The state engages in mere speculation when it claims that the lost evidence provides only a

partial alibi instead of a full alibi. Since the evidence is lost, we have no way to tell whether every night during the alleged period of the crimes can be accounted for, or whether the evidence would have considerably narrowed the dates that need to be accounted for, greatly simplifying Appellee's defense. Either way, the lost evidence appears to seriously affect Appellee's ability to even create a defense.

{¶28} Once actual and substantial prejudice is established on the record, the state is required to provide justification for the delay. The delay may be unjustifiable when the state, through negligence or error in judgment, effectively ceases the active investigation of the case but later decides to commence prosecution on the same evidence available at the time the active investigation stopped. *Luck* at 158. Although the length of the delay is always a consideration in cases of preindictment delay, it can be the determining factor when the delay is caused by the prosecutor's negligence, intentional act, or error in judgment. *Id.* In *Luck*, the Ohio Supreme Court held that 15 years of preindictment delay was unjustifiable after the prosecution re-commenced its case without any new evidence. *Id.* at 158-159. On the other hand, when the state becomes aware of new evidence and acts diligently on that evidence, a court may find that even a 13-year delay is justifiable. *Walls* at ¶56. The trial court in this case found that no justifiable reason was given for the delay and that the length of the delay was unreasonable.

{¶29} The record reflects that the state was either unwilling or unable to produce any new direct evidence to explain the delay in prosecution. There were two alleged items of new evidence. The victim told Detective Martin in 2012 that she remembered Appellee told her brother in 2003 that he "did these things to me." (Tr.,

p. 79.) Detective Martin testified that he spoke to the brother in 2012, and R.W.'s brother told him that in 2003 Appellee made certain admissions. The nature and content of these admissions is not in the record, other than that they somehow relate to sexual abuse. Based on this "new" evidence from 2003, Detective Martin testified that he set up a phone call between Appellee and R.W. in an attempt to extract some type of confession from Appellee. The contents of this phone call were not shared with the court at the hearing on the motion to dismiss, other than that they involved, according to Detective Martin's interpretation, admissions regarding sexual abuse.

{¶30} Despite the state's reference that evidence from the victim, the victim's brother, and Appellee himself existed, the only evidence the state actually produced at the hearing was the testimony of Detective Martin. In essence, instead of presenting any new evidence itself, the state allowed Detective Martin to give his interpretation of the alleged evidence. The court found that Detective Martin's testimony did not constitute or produce new evidence, and we agree. If the state sought to explain the delay by relying on new evidence, it needed to produce actual evidence at the hearing. Mere second- and third-hand discussion and interpretation does not equate to production of evidence. The trier-of-fact is certainly permitted to question whether vague general discussions and interpretations regarding alleged evidence justifies such a lengthy preindictment delay.

{¶31} We must note at this point that the state was not required to prove that it possessed new evidence. However, it was required to prove it had a justifiable reason for the delay in prosecution. While proof of new evidence may do this, new evidence alone does not necessarily justify a lengthy delay, and whether evidence

should be treated as new evidence is a determination to be made by the trial court. We also note that even if there was a justifiable reason for the delay, a court is not required to overrule a motion to dismiss. The reason for the delay must always be weighed against the prejudice to the defendant. In this case, the trial court indicated its concern that the initial case was prematurely closed before the investigation was complete. The decision reflects a belief that the state may have been at fault in failing to continue its investigation in 2003, and any evidence that arose after the case was closed would have been discovered much earlier had the investigation continued. Appellee's purported admission to his son in 2003, therefore, was not necessarily new evidence to support the delay in prosecution, even though it may have arisen after the case was closed, because it would have been discovered if the investigation had been more thorough or had continued for a longer period.

{¶32} More striking, though, is that there is not a single record of a specific statement, or even a paraphrase of a statement, made by Appellee that could be evaluated by either the trial court or on review to support the allegation that Appellee actually made an admission of guilt or involvement in some type of crime against his daughter. The state appears to argue that Appellee's failure to deny the accusations is proof of his guilt, but even if this were the state of the law in Ohio this record does not show that he was even given such an opportunity.

{¶33} At oral argument the state advanced that the victim's decision to cooperate with the investigation in 2012 was in itself new evidence. Although this may be a valid line of argument in some sexual assault cases, it does not appear to be true here. The record does not reflect that the state ever investigated whether the

victim was truly uncooperative in 2003. It was the victim's mother who told the investigator that her daughter was "shutting down." On this basis, along with the lack of any other evidence and the failure to investigate the other suspect, the investigation was closed. (Tr., p. 72.) Apparently, the victim was never asked if she would testify or about the nature of that testimony. It is also apparent that the state did not rely in the trial court on the victim's 2012 decision to cooperate in the investigation as new evidence justifying the delay. The state relied on Appellee's unspecified admission to his son in 2003, and the unspecified admissions in the telephone call in 2012. (Tr., p. 80.)

{¶34} The record contains evidence that Appellee suffered actual and substantial prejudice in the delay of prosecution due to the loss of impeachment and alibi evidence. The state countered with indirect evidence that Appellee may have made some type of admission to his son in 2003, and that a phone call was recorded in 2012 that may also have resulted in some type of admission by Appellee. The state did not actually produce this evidence. Instead, it allowed a detective to interpret the alleged evidence. The court determined that the state failed to conduct a complete investigation in 2003, and that the evidence as presented by the state did not establish a justifiable reason for the delay. Since the state failed to provide any new evidence, or at least enough indications that it had obtained new evidence to satisfy the trial court, and because the state failed to explain why the case was closed without a complete investigation, the trial court was correct in finding no justification for the preindictment delay and in dismissing the charges. We overrule

Appellant's assignment of error and affirm the trial court's judgment to dismiss on the basis of preindictment delay.

Donofrio, J., concurs.

Vukovich, J., concurs.