[Cite as *State v. Malone*, 2011-Ohio-2445.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellee

    v.

RENNELL M. MALONE

    Appellant

C.A. No.    10CA009754

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    06CR071825

DECISION AND JOURNAL ENTRY

Dated: May 23, 2011

DICKINSON, Presiding Judge.

{¶1} Diane Utsey-Henderson bled to death in her bedroom. Police interviewed her ex-boyfriend, Rennell Malone, after they found her body, but did not charge him with murder. They reopened the investigation several years later, and a grand jury indicted Mr. Malone for aggravated murder, murder, aggravated burglary, and felonious assault. The trial court convicted him of aggravated murder, murder, and felonious assault and sentenced him to life in prison with the possibility of parole after twenty years. Mr. Malone has appealed, arguing that the delay between the crime and his indictment violated his right to due process, that his attorney was ineffective because he did not file a motion to suppress Mr. Malone's statements to police, that his convictions are against the manifest weight of the evidence, and that the trial court incorrectly admitted evidence of other acts. We affirm Mr. Malone's convictions because he did not demonstrate that preindictment delay caused actual prejudice, his attorney was not ineffective,

his convictions are not against the manifest weight of the evidence, and the trial court did not admit any other acts evidence.

FACTS

{¶2} Ms. Utsey-Henderson and Mr. Malone dated and lived together in her house until early 2001. By some accounts, their relationship was turbulent and marked by frequent fights, break-ups, and reconciliations. When their relationship ended and Mr. Malone moved out, however, they stayed friends. Around the same time, Ms. Utsey-Henderson started dating James "Pooch" Williams.

{¶3} Ms. Utsey-Henderson celebrated her forty-fourth birthday with each man. Mr. Malone took birthday gifts to her house on her birthday, June 12, 2001, and helped repair a shelf in her bedroom. Later, they spent the evening at Mr. Malone's apartment. The next night, Ms. Utsey-Henderson visited her sister, then celebrated with Mr. Williams by eating pizza and drinking gin outside her house. Mr. Malone stopped by around 10:00 p.m. to return a hair clip to Ms. Utsey-Henderson. According to Mr. Williams, Ms. Utsey-Henderson "dressed [Mr. Malone] down pretty good" before he left. Around midnight, Mr. Williams left to spend the night with another woman at a Motel 6. Ms. Utsey-Henderson was not seen alive again.

{¶4} Ms. Utsey-Henderson left a voice mail message for her sister, Deloise Brantley, in the early hours of Thursday, June 14th, that said, "I got to tell you about the drama. It was drama, drama, drama." Ms. Brantley knocked on the door of Ms. Utsey-Henderson's house on Thursday, but left when no one answered. She came back on Friday, June 15th, and called the police when she saw through a window that the contents of her sister's purse were scattered on the floor. The police found Ms. Utsey-Henderson's body on the floor of her bedroom next to the bed, which was soaked through the mattress to the springs with blood.

**{¶5}** Ms. Brantley told police that her sister was involved with Mr. Malone and Mr. Williams. They interviewed both, but did not charge either with her murder. In 2004, the case file was reassigned to Detective Mark Carpentiere for investigation. Based, in part, on testing old evidence that had not previously been tested and on new information provided by Mr. Malone's cell mate at the Lorain County Jail, Mr. Malone was indicted in 2006.

PREINDICTMENT DELAY

**{¶6}** Mr. Malone's first assignment of error is that the five-year delay between Ms. Utsey-Henderson's murder and his indictment violated his right to due process. Because his argument relates to delay before he was indicted, the question is not whether his right to a speedy trial was violated, but whether he was actually prejudiced by unjustifiable delay before the indictment. See *State v. Luck*, 15 Ohio St. 3d 150, 153 (1984). A defendant must point to specific ways in which the ability to defend against the charges at trial was prejudiced. *Id.* In other words, "the defendant must demonstrate how the evidence that was lost due to delay would have aided the defense." *State v. Saxon*, 9th Dist. No. 09CA009560, 2009-Ohio-6905, at ¶9.

**{¶7}** Mr. Malone argued that his ability to defend himself was prejudiced by unavailability of witnesses; the fading memory of available witnesses; and the loss or destruction of evidence. He did not demonstrate that his defense was prejudiced in any of these ways.

**{¶8}** With respect to the availability of witnesses, Mr. Malone argued that his defense was hampered by the death of his uncle, Howard Daggs, and a missing witness. According to Mr. Malone, Mr. Daggs told him that something had happened to Ms. Utsey-Henderson, and his testimony would have explained why Mr. Malone did not ask why he had been taken into custody during his interview in 2001. Mr. Malone also argued that one of two laborers who power washed Ms. Utsey-Henderson's house before her death had disappeared. Mr. Malone's

defense was not prejudiced by the witnesses' unavailability, however, because another family member provided similar testimony about the events after Ms. Utsey-Henderson died and the other laborer testified about washing her house before she died.

{¶9} Mr. Malone identified one potential witness whose memory had allegedly faltered. According to Mr. Malone's attorney, Wendy Yearly's name surfaced as someone who might have information about the murder "as to seeing somebody else at the house at the appropriate time and so forth." The substance of her potential testimony, either before or after time had passed, was not established, and so Mr. Malone could only speculate about how his defense might have been prejudiced.

{¶10} Finally, Mr. Malone identified several pieces of evidence that were supposedly lost or destroyed before they could be examined by the defense. In each case, however, he failed to demonstrate how his defense was prejudiced by the passage of time.

{¶11} First, he argued that the lock to the door of Ms. Utsey-Henderson's house through which her murderer is assumed to have entered had not been retained as evidence. According to Mr. Malone, the key that was found in his possession could not be tested to determine whether it fit that lock if the lock was unavailable. Mr. Malone did not establish that testing the lock would have benefited his defense, but only that it could not be tested. Similarly, he argued that his own work records and Ms. Utsey-Henderson's work records were no longer available. He did not demonstrate how his defense was prejudiced by the absence of these records, only that "it would have helped us establish a more solid time line of what Ms. Utsey was doing at that time" and that Mr. Malone "did … go to work the next day and so forth[.]"

{¶12} He identified allegedly missing registration records from Motel 6 related to the alibi provided by Mr. Williams, but those records still existed and were provided to him. A

representative of Motel 6 also testified about the records. Mr. Malone also argued that a shoe print found outside Ms. Utsey-Henderson's house had not been preserved, but could not confirm that a shoe print had ever existed or that it would have benefited his defense. Finally, he maintained that records from Ms. Utsey-Henderson's caller ID box and pager could have demonstrated when Mr. Malone contacted her during her final days. Although records of her incoming calls were no longer available, Mr. Malone's own telephone records were available, and they documented calls to her pager and home telephone line. In addition, the contents of Ms. Utsey-Henderson's caller ID box were transcribed into written form by investigators shortly after her death and maintained as evidence.

{¶13}  At best, Mr. Malone argued that he might have been prejudiced by the passage of time between Ms. Utsey-Henderson's death and his indictment. Preindictment delay, however, only deprives a defendant of due process when actual prejudice is established. See *State v. Luck*, 15 Ohio St. 3d 150, at paragraph two of the syllabus (1984). Mr. Malone's first assignment of error is overruled.

INEFFECTIVE ASSISTANCE

{¶14}  Mr. Malone's second assignment of error is that he received ineffective assistance of counsel because his attorney did not file a motion to suppress recordings of his 2001 interrogation. Specifically, he has argued that the conditions during the five-hour interrogation were coercive and rendered his statements to police involuntary. "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *State v. Brown*, 115 Ohio St. 3d 55, 2007-Ohio-4837, at ¶65. Even if there is a reasonable probability that the motion would have been granted, the failure to pursue it cannot be prejudicial unless there is also a reasonable probability

that, without the excluded evidence, the defendant would have been acquitted. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 695 (1984)).

{¶15} Even assuming that Mr. Malone's statements were involuntary, there is not a reasonable probability that without those statements, the trial court would have acquitted him. Although Mr. Malone has argued that his "confession" was involuntary, Mr. Malone never confessed to Ms. Utsey-Henderson's murder. In fact, he did not make any statements that were inculpatory in and of themselves. The trial court did admit recordings made by the police, and some of the State's witnesses referred to his statements to demonstrate inconsistencies in his words and actions, but we cannot conclude that without this evidence, Mr. Malone would have been acquitted. His second assignment of error is, therefore, overruled.

MANIFEST WEIGHT

{¶16} Mr. Malone's third assignment of error is that his convictions were against the manifest weight of the evidence. When a defendant argues that his convictions are against the manifest weight of the evidence, we "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction[s] must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App. 3d 339, 340 (1986).

{¶17} The trial court convicted Mr. Malone of murder, aggravated murder, and felonious assault. Section 2903.02(A) of the Ohio Revised Code prohibits any person from "purposely caus[ing] the death of another[.]" Aggravated murder, as defined by Section 2903.01(A) of the Ohio Revised Code, is murder committed with "prior calculation and design." Section 2903.11(A)(1) prohibits any person from "caus[ing] serious physical harm to another[.]"

{¶18} Dr. Paul Matus, the Lorain County Coroner, testified that Ms. Utsey-Henderson bled to death from multiple knife wounds to her abdomen that struck her liver, gallbladder, aorta, kidney, and bowels. Dr. Matus also concluded that Ms. Utsey-Henderson had been struck on the head with "tremendous force" by a heavy object  The head injuries were "slightly curvilinear." He testified that, although the head injury would not have been fatal, it would have left her "disoriented and stunned." Because it was hot and humid in the house, Dr. Matus could only estimate a range of about forty-eight hours, beginning on June 11, 2001, within which Ms. Utsey-Henderson had died.

{¶19} Deloise Brantley testified that her sister had been in a chaotic relationship with Mr. Malone that involved frequent fights and periodic break-ups. According to Ms. Brantley, the couple's "last so-called fight" was about two weeks before her sister died and Ms. Utsey-Henderson was also dating Mr. Williams at the time. Ms. Brantley testified that she saw her sister for the last time on June 13, 2001, the day after her birthday, when Ms. Utsey-Henderson came to Ms. Brantley's house during the evening. According to Ms. Brantley, Ms. Utsey-Henderson left around 9:00 p.m. Two days later, Ms. Brantley called the police when she noticed her sister's car in her garage, found two days worth of newspapers on her porch, and saw through a window that her sister's purse had been overturned.

{¶20} Retired Detective Robert Poli testified that he responded to Ms. Utsey-Henderson's house after the crime scene had been secured. According to him, there was a rip or tear in the rear screen door through which one could reach the hook that latched it shut without difficulty. Detective Poli testified that he noticed the contents of a purse on the floor, but no signs of a struggle in the house. In the bedroom, he noticed that drawers had been pulled out and items thrown about, but also noticed that the right side of the bed was undisturbed. Ms. Utsey-

Henderson's body was found on the left side of the bed, which was unmade and soaked with blood. Based on the extent of her injuries and the blood that he found, Detective Poli expressed his opinion that the person who stabbed her would have to have been close to her, but it was possible that the killer might not have ended up covered in blood.

{¶21} Despite the scene in the bedroom, Detective Poli recalled that there were no signs of a struggle in that room either. He did notice blood on the right side of the bedroom doorframe, but found no other blood in the house. He testified that he later made a list of incoming calls from Ms. Utsey-Henderson's caller ID box, noting that there were many calls from Mr. Malone before she died, but none afterward. Detective Poli interviewed Mr. Malone at the Lorain Police Department and noticed that he had an injury on his right forearm that was "newer" but "in the healing stage." Detective Dennis Moskal, who photographed the murder scene, also noticed the blood stain on the door frame of Ms. Utsey-Henderson's bedroom and estimated that it was four and one-half feet from the floor.

{¶22} Detective Poli and Sergeant Albert Rivera searched Mr. Malone's apartment after his initial interview. They found a key in Mr. Malone's nightstand that fit the back door to Ms. Utsey-Henderson's house. According to Sergeant Rivera, Mr. Malone initially denied having a key to the house, but later told them that it "must have been Diane's key and she left it for him." Ms. Brantley testified that her sister always locked the doors to her house and that Mr. Malone did not have a key. Ms. Utsey-Henderson's daughter, Jan Utsey, testified that she did not have a key to her mother's house; that her mother had the locks changed after Mr. Malone moved out; and that her mother's own spare key had turned up missing about a month before she died.

{¶23} Detective Mark Carpentiere took over the investigation of Ms. Utsey-Henderson's murder in 2004. He learned that blood samples taken from the crime scene had not been sent for

DNA testing. When tested, blood from the bedroom doorframe was consistent with Mr. Malone's DNA profile. After Mr. Malone's arrest in 2006, Detective Carpentiere interviewed Mr. Malone's cell mate, Delmas Parsons. Mr. Parsons also testified. According to him, Mr. Malone talked to him around fifteen times about the case against him. Mr. Parsons said that he grew concerned when Mr. Malone asked, "Do you blame me?" He also testified that Mr. Malone said that Ms. Utsey-Henderson's head injury was caused by a glass serving tray that he broke and threw in a dumpster after her death. Jan Utsey confirmed that her mother had kept a "heavier" glass tray on her dresser that was never found.

{¶24} Mr. Malone has argued that his convictions are against the manifest weight of the evidence because Delmas Parsons, whom he characterizes as the State's "key witness," is a "life-long criminal" with racist tendencies. Regarding the credibility of Mr. Parsons' testimony, Mr. Parsons admitted that he had numerous tattoos that symbolized violence and hatred and that he had gotten those tattoos about twenty years earlier while he was in prison. According to Mr. Parsons, he "used to have a real problem with … [not] just African-Americans. It was everybody. The whole world." The trial judge saw the tattoos and heard Mr. Parsons' explanation of them and was entitled to believe his testimony about the conversations he had with Mr. Malone in prison. Mr. Malone has also argued that the evidence against him should be discounted because it was all circumstantial. Circumstantial evidence, however, does not inherently have any less probative value than direct evidence. See *State v. Jenks*, 61 Ohio St. 3d 259, 272 (1991). This Court has reviewed the entire record, and we cannot conclude that the trial court judge lost his way. Mr. Malone's third assignment of error is, therefore, overruled.

## OTHER ACTS EVIDENCE

**{¶25}** Mr. Malone's last assignment of error is that the trial court incorrectly allowed testimony that he slashed the tires of Mr. Williams' car and that he discussed incidents of violence against Ms. Utsey-Henderson with his cellmate. In this case, however, there is no other acts evidence in the record.

**{¶26}** Under Rule 404(B) of the Ohio Rules of Evidence, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Mr. Parsons testified about arguments with Ms. Utsey-Henderson that Mr. Malone described to him, but he did not testify about any incidents of violence other than those for which Mr. Malone was on trial. In that respect, his testimony concerned Ms. Utsey-Henderson's attitude toward Mr. Malone instead of actions that he took toward her. Mr. Williams testified that he suspected that Mr. Malone slashed the tires of his car and confronted him before Ms. Utsey-Henderson died, but he also testified that Mr. Malone denied it. Although some of these statements might have been objectionable for other reasons, they are not other acts under Rule 404(B). Because there was no other acts evidence, Mr. Malone's fourth assignment of error is overruled.

## CONCLUSION

**{¶27}** The delay between Ms. Utsey-Henderson's death and Mr. Malone's indictment did not actually prejudice his defense. Mr. Malone never confessed to killing her, and his attorney did not provide ineffective assistance by not filing a motion to suppress his statements to police. His convictions are not against the manifest weight of the evidence, and the evidence at trial did not include other acts under Rule 404(B) of the Ohio Rules of Evidence. The

judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CLAIR E. DICKINSON
FOR THE COURT

CARR, J.
BELFANCE, J.
CONCUR

APPEARANCES:

KREIG J. BRUSNAHAN, Attorney at Law, for Appellant.

DENNIS WILL, Prosecuting Attorney, and BILLIE JO BELCHER, Assistant Prosecuting Attorney, for Appellee.