[Cite as *State v. McKinley*, 2020-Ohio-3664.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellant, | : | No. 108715 |
| v. | : | |
| CHARLES MCKINLEY, | : | |
| Defendant-Appellee. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:**  July 9, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-633639-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jennifer M. Meyer and Mary Court Weston, Assistant Prosecuting Attorneys, *for appellant.*

Fernando Mack and Edward F. Borkowski, *for appellee.*

MARY J. BOYLE, P.J.:

{¶ 1}   Plaintiff-appellant, state of Ohio, appeals from a judgment granting defendant-appellee, Charles McKinley's, motion to dismiss for preindictment delay. The state raises three assignments of error for our review:

1. The trial court erred when it permitted appellee to raise alleged prejudice that he did not outline in his motion, thus prejudicing the state and the victim.

2. The trial court erred in finding substantial, actual prejudice.

3. The trial court erred in finding negligence or error in judgment by the investigating officers.

**{¶ 2}** Finding merit to the state's second assignment of error, we reverse and remand.

## I. Procedural History and Factual Background

**{¶ 3}** On October 24, 2018, McKinley was indicted on Count 1, rape in violation of R.C. 2907.02(A)(2), Counts 2 and 3, attempted rape in violation of R.C. 2923.02 and 2907.02(A)(2), and Count 4, kidnapping in violation of R.C. 2905.01(A)(4). The indictment alleged that the rape took place on January 29, 1999.

**{¶ 4}** McKinley filed a motion to dismiss for preindictment delay in February 2019. The trial court held a hearing on McKinley's motion on March 25, 2019, where the following evidence was presented.

**{¶ 5}** Special Agent Lindsey Mussell ("Investigator Mussell") was assigned to the case in 2017. She explained that on January 29, 1999, the victim, then 19 years old, went to a house located at 3450 E. 99th Street, Cleveland, Ohio. The victim reported that she went there with her coworker, James Tatum. The victim told police that Tatum eventually left the house but she remained. The victim told police that she was raped by four unknown males in an upstairs bedroom around 1:00 a.m. on January 29, 1999. After she left the house, the victim went to a friend's home and

then, at 6:30 p.m. that same day, she went to the hospital where a rape kit was collected. Detectives from the Cleveland Police Department's Sex Crimes Unit were assigned to the case and made "numerous attempts" to contact the victim, including leaving a voicemail message for her on February 17 and 24, 1999, and leaving a card at her house on March 4, 1999. The victim never returned their calls, so the case went cold.

{¶ 6} On January 13, 2012, Cleveland police submitted the victim's rape kit to the Ohio Attorney General's Bureau of Criminal Investigation ("BCI") for DNA testing. The male DNA found in the samples taken from the victim was entered into the Ohio Combined DNA Index System ("CODIS"). On August 16, 2012, a CODIS hit linked McKinley to the male DNA found in the victim's rape kit. When Cleveland police received this information, they attempted to locate the victim. Investigator Mussell stated that detectives sent a letter to the victim, the victim's mother, and the victim's friend, who was a possible witness in the case. Investigator Mussell said the detectives were not able to locate the victim at that time.

{¶ 7} In 2017, Cleveland police resubmitted the case to the BCI, which is when Investigator Mussell was assigned to the case. She said that this case became high priority due to the statute of limitations about to expire. Investigator Mussell found the victim using online databases. The victim was living out of state at that time. The victim told Investigator Mussell that she recalled that one of the rapists was referred to as "Trip" by the other males. The victim viewed a photo array and identified McKinley as one of the males who raped her.

**{¶ 8}** Investigator Mussell also interviewed the victim's friend, Nyja Brown, who remembered that the victim came to Brown's house after the rape. Brown remembered the victim was crying said that she had just been raped. Investigator Mussell located a James Tatum, but he was not the same Tatum who took the victim to the house on E. 99th Street in 1999.

**{¶ 9}** Investigator Mussell interviewed McKinley in August 2019. She showed McKinley a photo of the victim that was taken nine days before the alleged rape. The victim was wearing a fur coat in the photo. Investigator Mussell said that McKinley denied knowing the victim or that he had ever had sex with her. McKinley signed and dated the photo, indicating "no" that he did not recognize the victim. McKinley also denied knowing anyone named James Tatum. Investigator Mussell also stated that she showed McKinley a photo of the house on E. 99th Street, but he denied that he had ever been there. Investigator Mussell collected McKinley's DNA and confirmed what the "CODIS hit" had already established.

**{¶ 10}** McKinley testified that after he was charged in this case, he met and looked over the discovery with his defense counsel. McKinley stated that is when he began to recall an "interaction" with a woman who wore a fur coat. McKinley stated that the information that Investigator Mussell had shown him was "totally different from what [he] found out in discovery."

**{¶ 11}** After seeing a photo of a woman in a fur coat in discovery, McKinley stated that he remembered meeting the woman in 1999 at Vince's Café. He did not recall her name, but he believed it was the same woman who was now accusing him

of rape. He believed it was January 1999 because it was cold, and that is why the woman would have been wearing a fur coat. He said that they were both drinking "multiple drinks and having a nice conversation, [and] enjoying [themselves]."

{¶ 12} McKinley stated that the woman left the bar with him around 1:00 or 2:00 a.m. He testified that he took her to his cousin's house, which was the "Rankins' house." He said that his aunt, Dorothy Rankins, "pretty much raised [him] from the age 13, 14." The Rankins' house was located around "89th and Catharine and Union." He decided to go there because his place was too far away, and he had been drinking. As far as he could remember, he had to call someone to let him into the Rankins' house because he did not have a key. He could not recall if he and the woman had a drink in the house, but he remembered that they went upstairs to the "boys' bedroom" and had consensual sex.

{¶ 13} McKinley testified that he could not recall who was in the Rankins' house at that time. He said that other people must have been there, however, because otherwise, he would not have been able to get inside without a key. He said that in addition to his aunt, Michael, Portia, and Glenda Rankins lived there as well as James Wells and Mattie Brown. McKinley stated that Mattie Brown was bedridden from a stroke, so she would have been home, and her bedroom was below where he had sex with the woman in the fur coat. McKinley testified that he fell asleep, and when he woke up, the woman was gone.

{¶ 14} McKinley stated that if the case would have been brought against him in 1999, police could have interviewed the security guard and "bar maid" from

Vince's Café.  He said the "fur coat" would have probably "stood out" with the bar maid because there were not a lot of people wearing fur coats that night.  He could have also obtained surveillance footage from the bar, which would have shown the woman in the fur coat "willingly" left the bar with him.  He said that police could have also interviewed his Aunt Dorothy and Mattie Brown.  McKinley stated that his aunt now lived in Las Vegas.  He said that he spoke with his aunt; she did not recall anything about that night.  Mattie Brown passed away "five or ten years" after that night, but he said that she would have been able to say whether she heard "any disturbance."

{¶ 15} On cross-examination, McKinley said that he told Investigator Mussell that he had never had so much alcohol that he passed out and could not remember what happened.  He agreed that Investigator Mussell did not "rush" him when she showed him the woman's photo.  He said that the woman who Investigator Mussell showed him was not wearing a fur coat.  When the state established that in the photo Investigator Mussell showed him, the woman was wearing a fur coat, McKinley stated that he did not notice because he was focusing on her face.

{¶ 16} The state then showed McKinley the photo that Investigator Mussell showed him of the victim in this case.  McKinley agreed that the victim was wearing a fur coat in the photo.  McKinley admitted that his signature was on the back of the photo and that he signed it on July 19, 2018.  He further admitted that he told Investigator Mussell that he did not recognize the woman.  He also agreed that he wrote "no" on the back of the photo, which meant that he did not recognize the

woman.  The state then asked, "And do you recognize the woman in that photo today?"  McKinley responded:

> Still to this day I don't remember who that woman is, but since this whole situation is revolving around a fur coat after I read it in discovery, I remember having sex with a woman in a fur coat that I remember this. I remember this incident. I don't remember the female, herself, but I remember having sex with a female in a fur coat.  If the investigator would have asked me, "Do you remember having sex with a woman in a fur coat[,]" that would have sparked something. The fur coat wasn't brought up until the motion in discovery.  When she showed me the picture, I wasn't focused on the fur coat.  I was focusing on the picture.

{¶ 17} The state then asked McKinley again to confirm that Investigator Mussell did in fact show him a photo of a woman wearing a fur coat.  McKinley replied that she had but stated that Investigator Mussell "didn't mention" the fur coat to him.  McKinley further admitted that in the hour time span that he spoke to Investigator Mussell, he maintained the whole time that he had never seen the woman before that day.  McKinley insisted that when he "read the fur coat was involved" as he viewed he discovery in January 2019, that is when he remembered that he had sex with a woman in a fur coat.

{¶ 18} The state asked McKinley if the woman he had sex with was the woman in the photo.  McKinley responded, "From whatever that was brought to me, it was her."  When the state asked McKinley to explain further, McKinley stated, "That was the only female I took from Vince Café to the Rankins' house.  She had a fur coat on and this fur coat has got everybody -- got my brain thinking and remembering and it's linked to her.  I've never took another female to the Rankins with a fur coat."

{¶ 19} McKinley further stated on cross-examination that Michael Rankins was currently in jail at the Justice Center and that Portia and Glen Rankins and James Wells still lived in Cleveland. McKinley said that he had tried to get ahold of these people but had not been able to reach them.

{¶ 20} When asked why he had not told Investigator Mussell "any of the things" that McKinley testified to, he replied, "Because I was not asked those questions." The following exchange then took place:

[The state]: You told Investigator Mussell you don't remember any of this.

[McKinley]: I told her I don't remember this incident.

[The state]: And you don't remember that girl?

[McKinley]: Yeah, I don't.

{¶ 21} On redirect-examination, defense counsel again showed McKinley the same photo of the woman in the fur coat that he had dated and signed, stating "no" that he did not know the woman. Defense counsel asked McKinley if the woman in the photo appeared to be 19 years old. McKinley replied that the woman in the photo appeared older than 19 years old. McKinley stated that the woman looked like she was in her late twenties or early thirties.

{¶ 22} Investigator Mussell, however, testified that the photo of the woman in the fur coat that she showed McKinley was taken just nine days before the alleged rape took place. Thus, the victim was 19 years old in the photo that Investigator Mussell showed McKinley.

{¶ 23} After considering the evidence presented at the hearing, the trial court granted McKinley's motion to dismiss for preindictment delay. It found that the "missing evidence, specifically the loss of video surveillance footage, as well as the unavailability of the witnesses such as James Tatum, would create actual prejudice were the defendant required to stand trial today." The trial court further found that the state acted negligently in both 1999 and 2012 in ceasing the investigation when they were unable to locate the victim. The trial court stated that the rape kit existed in 1999 and could have been tested for DNA at that point. The trial court also found that the state was negligent because it failed to prosecute the case in 2012 after it received the CODIS link.

{¶ 24} It is from this judgment that the state appeals. We will address the state's assignments of error out of order for ease of discussion.

## II. Preindictment Delay Burden-Shifting Test

{¶ 25} An unjustifiable delay between the commission of an offense and a defendant's indictment for that offense, which results in actual prejudice to the defendant, is a violation of the right to due process of law under Section 16, Article I, of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus.

{¶ 26} The statute of limitations governing a crime provides the "primary guarantee against bringing overly stale criminal charges." *State v. Copeland*, 8th Dist. Cuyahoga No. 89455, 2008-Ohio-234, ¶ 10, citing *United States v. Lovasco*,

431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). The statute of limitations for rape is 25 years. R.C. 2901.13(A)(4).[1] Here, it is undisputed that McKinley was indicted within the statute of limitations for rape.

{¶ 27} Nonetheless, the delay between the commission of an offense and an indictment can, under certain circumstances, constitute a violation of due process of law guaranteed by the federal and state constitutions — even when the defendant is indicted within the statute of limitations. *Lovasco* at 789; *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). For instance, a delay in commencing prosecution is not justified when the state uses the delay to gain a tactical advantage or through negligence or error ceases its investigation, and then later, without new evidence, decides to prosecute. *Marion* at 324; *Luck* at 158.

{¶ 28} Courts apply a two-part test to determine whether preindictment delay constitutes a due process violation. Defendants have the initial burden to show that they were substantially and actually prejudiced due to the delay. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). But "proof of actual prejudice, alone, will not automatically validate a due process claim." *Luck*, 15 Ohio St.3d at 154, 472 N.E.2d 1097, citing *Marion*. Once a defendant establishes "actual prejudice," the burden then shifts to the state to produce evidence of a justifiable

---

[1] Prior to July 16, 2015, the statute of limitations for rape was 20 years. On July 16, 2015, however, the statute of limitations for rape prosecution increased from 20 years to 25 years. R.C. 2901.13(A)(4); 2015 H.B. No. 6. This increase is retroactive provided that the prosecution would not have been barred under the prior 20-year statute of limitations on July 15, 2015. R.C. 2901.13(L). In this case, the state would not have been barred under the prior statute of limitations on July 15, 2015, because the rape took place on January 29, 1999. Thus, the 25-year statute of limitation applies here.

reason for the delay. *Id.* Thereafter, the due process inquiry involves a balancing test by the court, weighing the reasons for the delay against the prejudice to the defendant in light of the length of the delay. *State v. Walls*, 96 Ohio St.3d 437, 775 N.E.2d 829, ¶ 51.

{¶ 29} In *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, the Ohio Supreme Court explained:

> A determination of actual prejudice involves "'a delicate judgment'" and a case-by-case consideration of the particular circumstances. *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *Marion*, 404 U.S. at 325, 92 S.Ct. 455, 30 L.Ed.2d 468. A court must "consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." *Id.* This court has suggested that speculative prejudice does not satisfy the defendant's burden. *Id.* at ¶ 56 (noting that Walls's claims of prejudice were speculative at best); [*State v.*] *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 100 (noting the difficulty for defendants claiming unconstitutional preindictment delay because "proof of prejudice is always speculative").

*Id.* at ¶ 52.

{¶ 30} "[T]he possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice." *Adams* at ¶ 105, citing *Marion*. "Those are 'the real possibilit[ies] of prejudice inherent in any extended delay,' and statutes of limitations sufficiently protect against them." *Jones* at ¶ 21, quoting *Marion*. "That does not mean, however, that demonstrably faded memories and actually unavailable witnesses or lost evidence cannot satisfy the actual-prejudice requirement." *Id.* Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant

to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense. *Id.* at ¶ 28, citing *Luck*. However, the burden upon a defendant seeking to prove that preindictment delay violated due process is "'nearly insurmountable,'" especially "because proof of prejudice is always speculative." *Adams* at ¶ 100, citing *United States v. Montgomery*, 491 Fed.Appx. 683, 691 (6th Cir.2012).

{¶ 31} We review a trial court's decision regarding legal issues in a motion to dismiss for preindictment delay pursuant to a de novo standard of review. *State v. Knox*, 8th Dist. Cuyahoga Nos. 103662 and 103664, 2016-Ohio-5519, ¶ 12, citing *State v. Gaines*, 193 Ohio App.3d 260, 2011-Ohio-1475, 951 N.E.2d 814 (12th Dist.). "De novo review requires an independent review of the trial court's decision without any deference to the trial court's determination." *State v. Clay*, 2d Dist. Miami No. 2015-CA-17, 2016-Ohio-424, ¶ 5.

{¶ 32} This court has held, however, that although we apply a de novo standard of review to the trial court's decision regarding the legal issues in a motion to dismiss based on preindictment delay, we afford great deference to the findings of fact made by the trial judge. *State v. Walker*, 8th Dist. Cuyahoga No. 106414, 2018-Ohio-3669, ¶ 15, citing *State v. Hunter*, 8th Dist. Cuyahoga No. 104789, 2017-Ohio-4180, ¶ 16. We must therefore accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982).

**A. Actual Prejudice**

{¶ 33} We will address the state's second assignment of error first because it is dispositive. In its second assigned error, the state argues that the trial court erred when it found that McKinley suffered actual prejudice by the preindictment delay. We agree.

{¶ 34} Although McKinley states that his alleged evidence was lost and witnesses are no longer available, "the possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 105, citing *Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468.

{¶ 35} McKinley argued to the trial court that if he had been prosecuted in 1999, he could have subpoenaed witnesses, including the security guard at the bar where claims he met a woman in a fur coat, the barmaid at the bar who supposedly saw them together, James Tatum who the victim claimed gave her a ride to the home where she said she was raped, his aunt who owned the home where he claims he took the woman in the fur coat to have sex, a bedridden woman who lived with his aunt, and several of his cousins who lived with his aunt. He also contends that he could have obtained video surveillance footage from the bar, which would have purportedly shown that the woman in the fur coat willingly left the bar with him.

{¶ 36} All of McKinley's alleged missing or lost evidence, however, means nothing to his case if the woman in the fur coat who he claims to have had sex with in 1999 was not the same person who told police in 1999 that four men raped her.

The trial court appears to have accepted McKinley's story as true despite the fact that McKinley repeatedly testified that he could not be sure that the woman in the fur coat who he supposedly met in 1999 was the same woman who told police in 1999 that four men raped her at a house on E. 99th Street. A trial court's factual findings, however, must be supported by competent, credible evidence. *See State v. Wood*, 9th Dist. Wayne No. 18AP0011, 2019-Ohio-3985, ¶ 9 (reversed trial court's decision after finding that "several of the trial court's findings of fact [were] not supported by competent, credible evidence.").

{¶ 37} McKinley testified on direct examination that once he viewed the discovery file and "read about the fur coat," that is when he remembered "an interaction" with a woman who had been wearing a fur coat. He testified to this even though he admitted on cross-examination that Investigator Mussell showed him the same photo of the victim that he later saw in discovery.

{¶ 38} McKinley tried to say that he did not recognize the victim when Investigator Mussell showed him the photo of her because in the photo that Investigator Mussell showed him, the victim appeared to be much older. McKinley was attempting to establish that Investigator Mussell did not show him a photo of the victim around the time of the alleged rape. But the state established that the photo of the victim that Investigator Mussell showed McKinley was taken just nine days before the victim reported the rape.

{¶ 39} Further and most significantly, when the state asked McKinley if he recognized the woman "in that photo today," McKinley replied, "Still to this day I

don't remember who that woman is." He further admitted on cross-examination that although he remembered having sex with a woman in a fur coat, he did not "remember the female herself." He actually stated that if the investigator would have asked him if he remembered having sex with a woman in a fur coat, it "would have sparked something." One of the state's final questions to McKinley was to ask him, "And you don't remember that girl?" In response to the state's question, McKinley admitted, "Yeah, I don't." The fact that McKinley supposedly met a woman in a bar who happened to be wearing a "faux fur coat" and took her his aunt's house to have sex is not enough to tie that woman to the victim in this case.

{¶ 40} After review, we find that McKinley simply did not provide competent, credible evidence to establish that the woman he claims to have met in the fur coat is the victim in this case. Therefore, the trial court erred when it accepted McKinley's version of the events as true for purposes of establishing actual prejudice and granting McKinley's motion to dismiss for preindictment delay.

{¶ 41} Even if we had found that McKinley sufficiently established that the woman he claims to have met at Vince's Café was the victim in this case (which he did not), McKinley's purported unavailable evidence would not have amounted to actual prejudice. First, McKinley did not establish that most of his missing or lost evidence was actually unavailable. McKinley admitted that besides talking to his aunt on the phone and Mattie Brown being deceased, he did not attempt to locate any of the people he claims to have been at his aunt's home that evening. As previously stated, McKinley bears the initial burden of establishing actual prejudice.

*Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 13.  A defendant's bald assertion that witnesses are unavailable without any explanation of efforts made to locate them is not sufficient.  *State v. Walker*, 8th Dist. Cuyahoga No. 106414, 2018-Ohio-3669, ¶ 20.  Indeed, McKinley stated that several of the people who he claimed might have been in his aunt's house that night still live in Cleveland, and he did not attempt to locate or talk to them.  But also, besides Mattie Brown and someone who had to have let him in the house, McKinley testified that he did not know who was at his aunt's home that night.  Therefore, McKinley's purported missing evidence is entirely speculative.

{¶ 42} With respect to Mattie Brown, McKinley claimed that she was bedridden, so she would have been home, and that her bedroom was below the room where he supposedly had sex with a woman in a fur coat.  He therefore argues that if she was alive, she would have heard if anything inappropriate had occurred between him and the woman.  Evidence that a witness is deceased is obviously sufficient to establish the witness's unavailability.  The death of a witness, by itself, however, is not enough to establish actual prejudice.  *Jones* at ¶ 26.  In this case, McKinley is speculating as to what Mattie Brown could offer his defense.  He could not say for certain that Mattie Brown was actually in her bedroom that night because he did not actually see her.  Although the lack of specificity of a missing witness's testimony does not render the claim of prejudice fatally speculative, it does in this case because McKinley fails to show that Mattie Brown's testimony would minimize

or eliminate the impact of the state's evidence or bolster McKinley's defense. *Jones* at ¶ 27.

{¶ 43} The same is true for the supposed barmaid and security guard at Vince's Café. McKinley's claim that these witnesses could have testified that he and a woman in a fur coat were drinking together at the bar and left the bar together. He also maintains that he could have obtained security camera footage from the bar if he had been prosecuted in 1999. McKinley's argument, however, ignores the fact that consent, even if initially given, can be revoked. Thus, these witnesses could not have testified in any credible manner as to whether the victim consented to sex later at McKinley's aunt's house.

{¶ 44} McKinley further argues that this case is similar to "three recent cases decided by this court, each of which affirmed a dismissal based on preindictment delay." The three cases cited by McKinley are *State v. Kafantaris*, 8th Dist. Cuyahoga No. 105937, 2018-Ohio-1397, *State v. Willingham*, 8th Dist. Cuyahoga Nos. 106706 and 107033, 2019-Ohio-1892, and *State v. Bourn*, 8th Dist. Cuyahoga No. 107525, 2019-Ohio-2327.[2] Unlike the present case, however, the victims in

---

[2] The state appealed our decisions in *Willingham* and *Bourn* to the Ohio Supreme Court. The Supreme Court accepted *Willingham* for discretionary review and accepted and held *Bourn* for its decision in *Willingham*. *See State v. Willingham*, Slip Opinion No. 2019-Ohio-3263, 129 N.E.3d 471; *State v. Bourn*, 157 Ohio St.3d 1510, 2019-Ohio-5193, 136 N.E.3d 499. The Supreme Court heard oral arguments in *Willingham* on May 12, 2020. The state's relevant proposition of law accepted by the Supreme Court in *Willingham* is:

> In a sexual assault case, a defendant does not establish actual prejudice, for purposes of a claim of preindictment delay analysis, through the loss of any evidence that might bolster a consent defense. At a minimum, there must be a reliable indication that such evidence existed and could have been

*Kafantaris* and *Bourn* as well as one of the victims in *Willingham* all knew the defendant at the time they made the rape allegations. Thus, except for the first victim in *Willingham*, these were not cold cases until a CODIS hit linked the defendants to the crimes. The defendants were known to police. And with respect to the first victim in *Willingham* who did not know who raped her, the defendant specifically remembered paying the victim for sex, unlike McKinley, who does not remember the victim in this case at all. *See Kafantaris* (victim and defendant met in a bar and exchanged phone numbers; the victim later agreed to allow defendant to come to her home at 4:30 a.m.; the victim stated that defendant raped her when he came to her house); *Willingham* (victim 1: victim worked as a dancer at a nightclub; she was raped as she walked to her car after work; defendant stated that he was a regular at the nightclub and that he remembered paying the victim to have sex; victim 2: victim and defendant met on the internet, victim met with defendant a few times in public, and then invited him over to her house; victim then claimed that defendant forced her to have sex); *Bourn* (victim saw the defendant at a bar; victim's friend reported that she saw defendant having sex with the victim while she was unresponsive; defendant came back to the victim's home at a later time and got into a fight with the victim's boyfriend). Thus, these cases are distinguishable from the present case and do not support McKinley's argument.

---

obtained, is non-speculative, and that such evidence was material and substantially probative on the issue of consent.

{¶ 45} Accordingly, McKinley's purported missing and lost evidence does not establish any prejudice, let alone substantial and actual prejudice. We therefore find that the trial court erred when it found that McKinley had established actual prejudice for purposes of dismissing his case based upon preindictment delay.

{¶ 46} The state's second assignment of error is sustained.

**B. Unjustifiable Delay**

{¶ 47} Because McKinley failed to carry his burden of establishing actual prejudice, the state did not have to establish that the delay in prosecuting McKinley was justified. Thus, we do not need to address the state's third assignment of error, in which the state argues that the trial court erred by finding that the delay was not justified. *See Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 107 (denying relief on claim of unconstitutional preindictment delay without considering reasons for delay when defendant failed to establish prejudice). Nonetheless, we will briefly address this assigned error. We note that even if we agreed with the trial court that McKinley established actual prejudice, we would still find that the state established that the delay was justified.

{¶ 48} The trial court found that the police acted negligently in 1999 when they ceased their investigation after they were unable to locate the victim and in 2012 when they failed to charge McKinley after receiving the CODIS link.

{¶ 49} As previously stated, a delay may be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant, "or when the state, through negligence o[r] error in judgment, effectively ceases the

active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased." *Luck*, 15 Ohio St.3d at 158, 472 N.E.2d 1097.

{¶ 50} Here, there is nothing in the record to suggest that the state used the delay to gain a tactical advantage over McKinley. Further, this is not a case where the state, through negligence or error, ceased its investigation and later, without new evidence, decided to prosecute. Unlike the cases in *Kafantaris*, 8th Dist. Cuyahoga No. 105937, 2018-Ohio-1397, *Bourn*, 8th Dist. Cuyahoga No. 107525, 2019-Ohio-2327, and the second victim in *Willingham*, 8th Dist. Cuyahoga Nos. 106706 and 107033, 2019-Ohio-1892, this was a cold case until McKinley's DNA was found to match the DNA found in the victim's rape kit in 2012. Police activated the case again at that point. They attempted to locate the victim by sending letters to her, her mother, and her friend, but they were not able to locate the victim. It was not until Investigator Mussell obtained the case in 2017 that she was able to locate the victim, who lived out of state. The victim viewed a photo array and identified McKinley as one of the males who raped her in 1999. We therefore conclude that the state established that it had a justifiable reason for its delay in prosecuting McKinley and, accordingly, the lower court erred in granting McKinley's motion to dismiss for preindictment delay.

{¶ 51} After review, we find that the trial court erred as a matter of law when it granted McKinley's motion to dismiss for preindictment delay because McKinley failed to meet his burden of establishing that he was actually prejudiced by the delay.

We further find that trial court erred as a matter of law when it found that the state acted negligently in not prosecuting McKinley sooner. Thus, the state's third assignment of error is sustained. The state's first assignment of error is moot in light of our disposition of its second and third assignments of error.

{¶ 52} Judgment reversed and remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., and
RAYMOND C. HEADEN, J., CONCUR